[Civ. No. 4174.   Fourth Dist.   Jan. 15, 1951.]

H. FRANK NELSON, Appellant, v. LOUIS B. MAYER,
Respondent.

Frank E. Carleton for Appellant.

Neil S. McCarthy and Thompson & Colegate for Respondent.

GRIFFIN, J.—Defendant and respondent owned the Mayer
Stock Farm in Riverside County.   On September 30, 1947,
one Myron S. Fox, business manager for defendant, signed
and delivered to plaintiff, a licensed real estate broker, the
following letter:

"Dear Frank:

"The price on the Mayer Stock Farm is $600,000.   It con-
sists of 504½ acres of irrigated land together with buildings,
improvements and attendant equipment.

"We will pay you a realty commission of 5 per cent if
you can *effect* a sale."   (Italics ours.)

Plaintiff's evidence shows that he unsuccessfully endeavored to interest various persons in the purchase of the property. He testified that about October 7, 1948, plaintiff, at the Mathews ranch, told one Ben Mathews, a former client, to whom plaintiff had previously sold a ranch, that he had the Mayer Stock Farm listed for sale; that Mathews was, at the time, an attorney at law and attorney in fact for Ellsworth M. Statler, the ultimate purchaser of the property described; that after some discussion about the property Mathews told plaintiff he was not interested in it; that plaintiff saw Mathews again in November, 1948, at plaintiff's home, where Mathews came in regard to some business in connection with Mathews' own ranch; that plaintiff again discussed the Mayer property with Mathews and that Mathews said he was in "too big a hurry" to view the premises; that about December 4, 1948, plaintiff was advised that the farm had been sold and that he phoned Mathews about it; that plaintiff was asked how he knew about the sale and that plaintiff informed Mathews of his source of information; that later that day plaintiff accused Mathews of buying the Mayer farm and that Mathews told him he was "100 per cent wrong"; that he was in no way interested in the purchase of it but he did have a friend who intended to buy it and he was negotiating for its purchase; that plaintiff told Mathews he had tried to interest him and Mr. Statler in taking the ranch and that if it was sold he expected his five per cent commission.

Plaintiff then testified that he conversed with Mr. Fox at the Mayer farm and told him that he understood Mr. Fox had sold the Mayer farm and that Fox said: "Well, you know how it goes; 10 deals to make one. On today, off tomorrow—We have a deal on it. It looks very good"; that he would rather not discuss the deal nor disclose the names of the principals until the deal was closed; that plaintiff said to him: "By any chance are you negotiating with Mr. Ben Mathews?" And that Fox said: "Who is Ben Mathews?"; that plaintiff told him he was "trustee" of Mr. Statler, and that he had presented the ranch to Mr. Mathews on two different occasions for "his and Statler's consideration"; that if he was negotiating with Mr. Mathews, his client, he expected his five per cent commission; and that Mr. Fox assured him he had never met Mathews.

On November 30, 1948, escrow instructions were signed by Mathews, as attorney in fact for Mr. Statler, and a Mrs.

Harless (formerly Miss Howard) and by defendant Louis B. Mayer, and placed in escrow.

A grant deed dated January 19, 1949, was received in evidence showing Louis B. Mayer as grantor and Ellsworth M. Statler and Meredith Howard Harless, as grantees, covering the Mayer farm. The grantees executed a trust deed back to the grantor signed "Ellsworth M. Statler, by Ben B. Mathews, his attorney-in-fact." A general power of attorney from Statler to Mathews, dated December 20, 1948, was then received in evidence. A chattel mortgage on the personal property was also executed by Statler in the same form. In August, 1949, Mrs. Harless deeded her undivided one-half interest in the property to Statler.

Defendant, Mr. Mayer, testified generally that Mrs. Harless had been in his employ for a number of years; that he met her in Washington, D. C., in October, 1947; that she asked him what he was going to do with his farm; that he told her he was going to sell it; that she said she could sell it for him if he would give her a chance; that he told her if she did he would pay her five per cent of the amount and expenses in traveling to California to show it to customers; that he discussed with her the terms of sale; that she was then engaged to Mr. Harless, a Congressman, and attorney for Mr. Statler; that Mr. Statler wanted to do something for Harless and that she believed Mr. Harless could sell the ranch to Statler; that he told her to "go ahead" and try; that in the fall of 1948, he met her in Perris, Riverside County, about three weeks before the escrow was opened, accompanied by a man named Mathews; that he had never met Mathews before; that Mathews told him that Statler wanted to do something for Harless so he could make some money; that Mrs. Harless returned to Washington, D. C., and that later they agreed upon terms and defendant sold the property for $400,000; that he had never met plaintiff or ever talked to him, nor had he ever been told by plaintiff that plaintiff had ever interested anyone in the sale of the property until after this action had been filed; that he paid Mrs. Harless $20,000 for her services. Canceled checks showing such payments were received in evidence. He then testified that he had never met Mr. Statler.

Mathews testified that while he was practicing law in Arizona he was and still is attorney for Mr. Statler; that Mr. Harless became Mr. Statler's attorney in 1948; that he met with Harless in Arizona in September, 1948, and also met

Miss Howard, who later became Mrs. Harless; that up until that time he did not know the Mayer Stock Farm was for sale; that Miss Howard said she was authorized to sell it; that she said she knew Mr. Mayer and could obtain a better price on it than "anybody in the world"; that the property was near Mathews' farm and that she would introduce Mayer to Mathews some day; that she asked him if Statler would be interested in the farm; and suggested that Mr. Harless could take care of it; that he said he would go and look at it; that the sale of the property was discussed by Harless with Statler in Arizona; that the first time Mathews went over the ranch was with the foreman about October, 1948; that Mrs. Harless and Mr. Mayer came out to the property about November 21, 1948; that he had never met Mr. Mayer until that time; that subsequently he had gone over the ranch with Mr. Statler and a real estate consultant; that that was the first time he ever mentioned the Mayer ranch to Mr. Statler; that he never said anything to him as to whether he should or should not purchase it; that as a result of a conversation with Mr. Statler following that time, he opened the escrow and received a power of attorney from him. He admitted having a conversation with plaintiff at his home earlier in the year in which plaintiff stated he had the Mayer Stock Farm for sale; and that he told plaintiff he was not interested. He specifically denied that Statler's name was ever mentioned in any of his conversations with plaintiff. He stated plaintiff talked with him at plaintiff's home when he approached him about a right-of-way but that he told plaintiff he was not interested in the Mayer Stock Farm; that it "was out of my class"; that Statler's name was never mentioned and he refused to view the property with plaintiff; that he never conversed with plaintiff again until plaintiff called him after the escrow instructions had been signed; that plaintiff then accused him, personally, of buying the Mayer Stock Farm and trading in some of his own acreage on the deal; that he definitely told him he had no interest in the Mayer Stock Farm; that it was not sold to him, but he then told him he had a friend who was negotiating for it.

Mrs. Harless related a conversation had with Mr. Mayer in Washington, D. C., when he was about to sell a number of his horses. She corroborated Mr. Mayer's testimony about the sale of the farm by her; and stated that he paid over $700 of her expenses in her effort to sell it; that she discussed the contemplated sale of the property to Mr. Statler with Mr.

Harless, his then attorney, in Washington, D. C., in the summer of 1948, and again in Arizona in November, 1948, when Mr. Mathews was present; that she next saw Mathews when they visited the Mayer farm in November, 1948; that at that time she discussed the price with Mr. Mayer, who agreed that it would be $400,000; that subsequently she and Mr. Harless were married; that Mr. Harless and Mr. Statler visited the ranch and the deal was consummated. Mrs. Harless was not a licensed real estate agent and, as one of the coowners, paid no portion of the purchase price of the property.

After argument, the jury returned a verdict in favor of plaintiff for five per cent of the sale price. A motion for new trial was made on all statutory grounds. The court granted it on insufficiency of the evidence and held that the verdict was "clearly against the weight of the evidence." Plaintiff appealed from the order.

The issue presented to the jury, under this conflict of evidence, was mainly whether plaintiff, according to the terms of the writing signed by Myron S. Fox, the admitted agent of Mr. Mayer, "*effected*" the sale of defendant's farm as described in the letter.

It may be questioned whether or not the evidence produced by plaintiff, based upon the agreement in evidence, would support a verdict in his favor.

In *Wright & Kimbrough* v. *DeWees*, 52 Cal.App. 42, 46 [197 P. 957] (Hearing in the Supreme Court denied), quoting from *Kimmell* v. *Skelly*, 130 Cal. 555, 559 [62 P. 1067], it is said:

"'The parties to a brokers' contract are at liberty to make the compensation of the broker depend upon any lawful conditions they see fit to place therein. The single question is, What does the contract provide?'"

And after discussing many cases based upon various provisions in brokers' contracts, the following principle is there laid down: that to entitle a broker to a commission for the sale of real estate, which he has been given by the owner authority to sell, he must produce before the owner a purchaser ready, willing and able to purchase at the price and on the terms specifically expressed in the contract of employment; that while a change made by the owner, when consummating the sale, in the price of the land or the terms of the sale from those specified in the broker's contract cannot of itself affect or impair in any way the right of the broker to his commission,

the latter cannot claim a commission unless his efforts are the procuring or inducing cause of the sale. In order for the broker to recover, the evidence must show that his efforts were the procuring cause and not merely one in a chain of causes. See, also, *Snook* v. *Page*, 29 Cal.App. 246 [155 P. 107]; *Dolan* v. *Scanlan*, 57 Cal. 261; *Ayres* v. *Thomas*, 116 Cal. 140 [47 P. 1013]; and *Deovletian* v. *Whitney*, 55 Cal.App. 76 [202 P. 905], wherein the term "to effect a deal" is defined. See, also, *Sessions* v. *Pacific Imp. Co.*, 57 Cal.App. 1, 17 [206 P. 653], wherein it is stated:

"A broker's contract presupposes that he shall be the *causa causans*, the foundation of the negotiations, but he need not be the sole cause or *causa sine qua non.*"

That "To constitute himself the *causa causans*, the predominating effective cause, it is not enough that the broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest. He must set in motion a chain of events, which, without break in their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities."

We purposely refrain from passing upon the question of whether plaintiff has established a cause of action by the evidence. This is not necessary to the solution of the problem here presented. It is true that there is considerable of plaintiff's evidence which is directly in conflict with that produced by the defendant and defendant's evidence would support a verdict in his favor. ■ The trial court has concluded that the verdict in favor of plaintiff "is clearly against the weight of the evidence." Under these circumstances, an appellate court is not entitled to substitute its judgment in place of that of the trial court on a hearing of a motion for new trial on the question of the insufficiency of the evidence. The rule is stated in *Perry* v. *Fowler*, 86 Cal.App.2d 635, 637 [195 P.2d 78], as follows: (quoted from respondent's approved argument set forth therein).

" 'A motion for a new trial upon the ground of insufficiency of the evidence is left to the sound discretion of the trial court. The judge is not bound by any conflict in the evidence and if, in the opinion of the judge, the verdict is against the weight of the evidence, it is his duty to set it aside. In other words, parties to an action are as much entitled to the judgment of the judge as to the sufficiency of the evidence to support the verdict as they are in the first instance to a judgment of the jury.' " (See, also, *Smith* v. *Royer*, 181 Cal. 165, 171 [183

P. 660]; *City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 152, 167 [287 P. 496]; *Green* v. *Soule*, 145 Cal. 96 [78 P. 337].)

Since there was substantial opposing evidence to that produced by the plaintiff, no abuse of discretion is shown and the order granting a new trial should be affirmed.

█ Lastly, it is argued that vital and material evidence was suppressed and withheld which, if produced, would have been adverse to defendant's claim that Mrs. Harless, and not plaintiff "effected" the sale. In this connection it is contended that defendant failed to produce as witnesses Mr. Statler and Mr. Harless, whose testimony would have shed light on the veracity of the testimony of defendant's witnesses, citing such cases as *Bone* v. *Hayes,* 154 Cal. 759 [99 P. 172]; and *Bagley* v. *McMickle,* 9 Cal. 430.

In the first place, the evidence shows that these two witnesses reside outside of the State of California and were not within its jurisdiction. There is no evidence to show that their testimony was available to defendant at the trial. If plaintiff believed their testimony would be adverse to the testimony of defendant's witnesses, their testimony was equally available to plaintiff. If their testimony would corroborate the testimony of defendant's witnesses, it would be but cumulative and would furnish no grounds for denying a motion for new trial. Even though the trial court may have been authorized to presume that their testimony would have been adverse to defendant, the court weighed the evidence produced, together with all presumptions arising therefrom, and after exercising its independent judgment in respect thereto, concluded that a new trial should be granted. Since the trial court is given such wide discretion on the question of granting a new trial on the ground of insufficiency of the evidence, we cannot hold that its determination on that issue was an abuse of discretion.

Order granting a new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied February 14, 1951, and appellant's petition for a hearing by the Supreme Court was denied March 15, 1951.