[Civ. No. 4751. Fourth Dist. Jan. 5, 1954.]

ORVA NELSON, as Executrix, etc., Appellant, v. LOUIS B. MAYER, Respondent.

Frank E. Carleton for Appellant.

Neil S. McCarthy and Thompson & Colegate for Respondent.

MUSSELL, J.—This is an appeal from a judgment in favor of defendant entered pursuant to a directed verdict, the action being one to recover a real estate broker's commission. The evidence presented by plaintiff is substantially the same as that in a former trial of the action in which a jury returned a verdict in favor of plaintiff H. Frank Nelson. A new trial was granted in that action and on appeal the order granting it was affirmed by this court. (*Nelson* v. *Mayer*, 101 Cal.App. 2d 733 [226 P.2d 20].)

### Plaintiff's Evidence

Defendant Louis B. Mayer, owner of a stock farm in Riverside County, authorized his business manager, Myron S. Fox, to sign and deliver to Nelson, a licensed real estate broker, the following letter:

"MAYER STOCK FARM

Perris, California

"September 30, 1947.

"Mr. H. Frank Nelson
Perris
California

"Dear Frank:

"The price on the Mayer Stock Farm is $600,000. It consists of 504½ acres of irrigated land together with buildings, improvements and attendant equipment.

"We will pay you a realty commission of 5 per cent if you can effect a sale.

"Yours very truly,
/s/ M. S. Fox
Myron S. Fox
Business Manager for Mr. Mayer."

H. Frank Nelson died on April 15, 1952, and from his testimony at the former trial of this action it appears that he first discussed the Mayer farm with Ben Mathews (to whom he had previously sold a ranch); that the first conversation with Mathews was at the Mathews ranch in September or early October, 1948, and was as follows:

"I told Mr. Mathews on this particular day that I had just been advised by Myron Fox, Louis B. Mayer's manager, that the Mayer farm, stock farm, could be had in two parcels, and I said, 'Why don't you and Mr. Statler then come down and take a look at this ranch, and let me show you the property, and take it over?' And he said, 'What would I do with it?' I said, 'You can do the same thing that Mr. Mayer has been doing with it: raise horses and cattle. You can bring over some registered Brahman cattle from Arizona that you were going to bring over to this ranch that I have previously sold you.' He said 'Now, I have got a pretty big program here, Frank. I don't think I am interested.'"

That the next conversation with Mathews took place (apparently on or about November 9, 1948) at the Nelson home, where Mathews went to obtain Nelson's signature in connection with a right of way through Mathews' farm; that Mathews asked for the "story" and the best price on the Mayer ranch and was informed that he, Nelson, was authorized to sell it for $600,000; that he asked Mathews why he didn't take the property over and suggested that he view the premises; that Mathews stated he was "in too big a hurry today to do anything," and left; that on December 4, 1948, plaintiff learned that the ranch had been sold and phoned Mathews about it; that he told Mathews he thought Mathews was the one who had bought the farm; that Mathews said, "Mr. Nelson, you are just one hundred per cent wrong. I am in no way interested in the purchase of the Mayer farm with my money, with my equipment or in any other manner, but I will tell you one thing, I do have a friend who is interested and who is negotiating for the purchase of the Mayer farm"; that he told Mathews he had tried to interest him and Mr. Statler in taking the ranch and if it were sold, he expected his 5 per cent commission; that he then had a conversation with Mr. Fox in which he was informed by Fox that they had a deal on the ranch but that he would rather not discuss it or disclose the names of the principals until the deal was closed and that he had never met Mathews.

442

Mrs. Nelson testified that she was present at a conversation between her husband and Mathews during the latter part of September or the early part of October, 1948.; that her husband asked Mathews if he would be interested in buying the Mayer ranch and Mathews said "No, he was not interested. What would he do with it?"; that her husband said, "Well, you can raise your Brahman steers and I think it is a very good proposition for you and Mr. Statler," and that Mr. Mathews said, "No, Mr. Nelson, I don't think I would be interested," or something like that; that Mr. Mathews said he was not interested in buying any part of the ranch; that she was also present at the conversation between her husband and Mathews at her home on or about November 9, 1948.

On December 6, 1948, escrow instructions were signed by Mathews as attorney in fact for Mr. Statler, and a Mrs. Harless, formerly Miss Howard, and by defendant Louis B. Mayer. A grant deed to the Mayer farm, dated January 19, 1949, was received in evidence showing Louis B. Mayer as grantor and Ellsworth M. Statler and Meredith Howard Harless as grantees. A trust deed was executed by Ellsworth M. Statler by Ben F. Mathews, his attorney in fact, and a chattel mortgage on the property was also executed by Statler in the same form. A general power of attorney from Statler to Mathews was executed on June 12, 1937, and again on December 20, 1948, and in August, 1949, Mrs. Harless deeded her undivided one-half interest in the property to Statler.

### Defendant's Evidence

Louis B. Mayer testified that Mrs. Harless had been in his employ for a number of years; that in October, 1947, in Washington, D. C., he told her he was going to sell his farm and employed her to sell it for him; that he told her he would pay her 5 per cent commission and expenses, if she was required to do any traveling; that between October, 1947, and until September 1, 1948, he had communications with her in connection with what she was doing about the sale of the ranch; that she said Mr. Harless, to whom she was engaged, was attorney for Mr. Statler and that she believed she could sell the farm to Statler; that Mr. Harless could; that he said, "Go ahead"; that about November 15, 1948, he met her in Perris, California; that she was then with Mr. Mathews, whom he had never seen before; that Mathews stated that Statler wanted to do something for Harless so he could make some money; that the terms of the deal were then agreed upon with Mrs. Harless; that he had never met

the plaintiff, Mr. Nelson, until after this action was filed; that Mr. Nelson never communicated with him personally; that he had not interested anybody in the sale of the ranch; that he had never met Mr. Statler and that he paid Mrs. Harless $20,000 and expenses for her services in selling the farm.

Mrs. Harless testified that in 1947 she had a conversation with Mr. Mayer in Washington, D. C., and at that time he told her to "go ahead" and look for a buyer for the ranch; that she discussed the sale of the property with Harless in Washington in the spring of 1948 and asked him if Mr. Statler would be interested in buying it; that she first met Mr. Mathews in Phoenix, Arizona, and four or five days later she told both him and Mr. Harless about the ranch and the terms of sale; that she asked Mathews if he could influence Mr. Statler in the purchase of the ranch and Mr. Mathews said, "Well, you are with his attorney, Mr. Harless, talking with him"; that a few days later she again discussed the property with Mr. Harless and Mr. Mathews; that in October Mr. Mayer stated that he would accept $400,000 for the property and throw in the equipment; that on November 21, 1948, she drove to the ranch with Mr. Mayer and they met Mathews on the ranch; that she introduced him to Mr. Mayer and informed Mathews of the price of the ranch; that she had never heard the name of Frank Nelson before the transaction was closed; that Mr. Mathews did not at any time mention Mr. Nelson or any other real estate agent.

Richard F. Harless testified that he became attorney for Ellsworth Statler in January, 1948, and was his attorney through that year and into the latter part of 1949; that he knew in 1947 and 1948 that Miss Howard had a listing on the Mayer ranch and was trying to sell it; that she asked him if Statler might be interested in buying the property; that about September 7, 1948, he discussed the ranch with Statler; that he called Miss Howard and she came to Phoenix and discussed the matter with him and with Mr. Mathews; that Mathews had been Mr. Statler's attorney for many years and he, Harless, wanted to discuss the matter with him; that when he and Statler discusesd the ranch, Statler stated that he would like to know more about it; that he had a great deal of respect for Mr. Mathews and on some occasion might discuss it with him. He then suggested that Harless also discuss the matter with Mathews; that thereafter he talked to Mr. Statler several times and told him that he had

discussed the ranch with Mathews and that Mathews indicated that it was worthwhile; that Statler stated that he would like to see the ranch; he was definitely interested and would inspect it at the earliest possible date; that Statler later stated that he had seen the ranch, that he thought it was a wonderful property and he hoped things could be worked out because he would like to buy it.

Mr. Mathews testified that previous to January, 1948, he had been attorney for Statler for about 11 years; that in January, 1948, he began to turn over his business in Arizona to Harless; that on or about September 6, 1948, in Phoenix, Arizona, he first learned that the Mayer ranch was for sale; that he had met Mr. Harless and Miss Howard on that date and Miss Howard advised him that she was authorized by Mr. Mayer to sell the property; that she asked if Mr. Statler would be interested in it to which he replied, ''Why don't you ask his attorney, he is sitting right at the table,'' pointing to Harless; that he informed Miss Howard that personally he did not like the idea and that, after all, it was Statler's affair and not his; that at the request of Miss Howard he went to the ranch and looked around it; that on October 8 or 10, 1948, Nelson told him that he had the Mayer ranch for sale and asked him if he was interested in it; that he said, ''No, it was out of his class''; that he did not mention Mr. Statler at all nor did he say anything about Brahman cattle; that he next saw Mr. Nelson at his home on November 9, 1948, at which time Nelson again asked if he would be interested in the Mayer farm; that he told Nelson it was out of his class; that he did not have that kind of money and that he had much more ranch than he needed; that he was in a hurry and didn't have time to discuss anything; that he did not ask Nelson for the ''story'' on the Mayer ranch, ask the price of it, or inquire as to the condition of the water on the ranch; that from November 9, 1948, until the 4th day of December, 1948, Nelson never communicated with him with reference to the ranch; that he and Statler went over the ranch about November 7, 1948; that later he had a conversation with Statler in which he told him to ''go ahead'' with the deal; that he informed Statler of the terms of the transaction, went to the title company on November 30, 1948, and signed the escrow instructions under his power of attorney; and that Nelson at no time took him to the ranch.

The sole question on this appeal is whether the trial court invaded the province of the jury in directing a verdict for the defendant.

 The rules relative to the authority of a trial court to direct a verdict are discussed in *Gish* v. *Los Angeles Ry. Corp.*, 13 Cal.2d 570, 573 [90 P.2d 792], and it is there said:

"The right of a court to direct a verdict is the same as the right of a court to grant a nonsuit. This can be done only when, disregarding conflicting evidence and giving plaintiffs' evidence all the value to which it is legally entitled, including every legitimate inference which may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such verdict was given. (*Newson* v. *Hawley*, 205 Cal. 188 [270 Pac. 364].)"

█ In the instant case Nelson's authority to sell the property involved was not exclusive. Defendant therefore reserved the right to sell his farm by his own unaided efforts without becoming liable to Nelson for a broker's commission. (*Snook* v. *Page*, 29 Cal.App. 246, 247 [155 P. 107]; *Wright* v. *Vernon*, 81 Cal.App.2d 346, 347 [183 P.2d 908].) He also reserved the right to sell through another agent or broker if he so desired. (*Hill* v. *Knight*, 209 Cal. 14, 21 [285 P. 691].)

█ Nelson, in order to recover commission, was required to produce before Mayer a purchaser ready, willing and able to purchase at the price and on the terms specifically expressed in the contract of employment (in this case the letter of September 30, 1947); and while a change made by Mayer when consummating the sale in the price of the land or the terms of the sale from those specified in the contract could not of itself affect or impair in any way the right of Nelson to his commission, the latter could not claim a commission unless his efforts were the procuring cause of the sale.

█ In order for plaintiff to recover, the evidence must show that Nelson's efforts were the procuring cause of the sale and not merely one in a chain of causes. (*Nelson* v. *Mayer*, supra, p. 738.) █ As was said in *Sessions* v. *Pacific Improvement Co.*, 57 Cal.App. 1, 17 [206 P. 653]:

"To constitute himself the *causa causans*, the predominating effective cause, it is not enough that the broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest. He must set in motion a chain of events, which, without break in their continuity cause the buyer and seller to come to terms as the proximate result of his peculiar activities."

█ In *Hill* v. *Knight*, supra, page 20, the court said, quoting from *Naylor* v. *Ashton*, 20 Cal.App. 544 [130 P. 181]:

" 'It must further appear that the broker performed the duty assumed by him within the time limit in his contract, or within such extension of time as may have been granted by his employer. If he failed to do that, he is not entitled to the commissions, even though he made efforts to sell property, and first called to it the attention of the party who subsequently made the purchase, unless the delay was caused by the negligence, fault or fraud of the owner.' " (Citing cases.)

The court then quoted from *Cone* v. *Keil*, 18 Cal.App. 675 [124 P. 548], as follows:

" 'Merely putting a prospective purchaser on the track of property which is on the market will not suffice to entitle the broker to the commission contracted for, and even though a broker opens negotiations for the sale of the property, he will not be entitled to a commission if he finally fails in his effort, without fault or interference of the owner, to induce a prospective purchaser to buy or make an offer to buy, notwithstanding that the owner may subsequently, either personally or through the instrumentality of other brokers, sell the same property to the same individual, at the price and upon the terms which the property was originally offered for sale.' "

Plaintiff's evidence, in the light of the rule stated in the foregoing cases, is not, in our opinion, sufficient to support a verdict in his favor. Nelson did not effect a sale of the property. He did not put the buyer and the seller together or cause a meeting of minds upon the sale or the terms thereof. The conversations which took place between Nelson and Mathews do not show that Mathews was a prospective purchaser. He stated definitely that he was not interested in buying the property. In this connection it may be noted that after the conversation with Mathews on November 9, 1948, Nelson talked with Mr. Fox and obtained a reduction in the price of the farm but did not go back to Mathews and tell him he had better terms or make an effort to contact him and open negotiations for the sale of the property.

Appellant argues that plaintiff's direct evidence and reasonable inference therefrom was strengthened by defendant's evidence. We find no merit in this contention. Defendant's evidence shows that the sale of the property was effected through the efforts of Meredith Howard Harless and her husband, Richard Harless. Where, as here, the evi-

dence is of such a conclusive character that the trial court in the exercise of a sound judicial discretion would be compelled to set aside a verdict returned in opposition to it, the jury was properly instructed to return a verdict for the defendant. (*Washer* v. *Bank of America*, 87 Cal.App.2d 501, 506 [197 P.2d 202].)

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied January 25, 1954, and appellant's petition for a hearing by the Supreme Court was denied March 3, 1954. Carter, J., was of the opinion that the petition should be granted.