[Civ. No. 20176. First Dist., Div. One. Aug. 30, 1962.]

GLENN D. WILSON, Plaintiff and Respondent, v. HENRY ROPPOLO et al., Defendants and Appellants.

Charles M. Giovanetti and DeMeo & DeMeo for Defendants and Appellants.

Leon J. Libeu and James E. Jones, Jr., for Plaintiff and Respondent.

BRAY, P. J.—Defendants appeal from a judgment in favor of plaintiff for a real estate commission.

## QUESTION PRESENTED

Did plaintiff produce a buyer ready, able and willing to buy within the time allotted in the listing agreement?

278

It is conceded that on January 9, 1956, plaintiff through his salesman, Carlson, received an "open" listing agreement from defendants authorizing him to sell certain real property belonging to them, and providing that defendants would pay a commission upon sale. The agreement provided: "This employment and authorization automatically cancels 6 months from date, on *June 9*, 1956." (Emphasis added.) The evidence shows, and the court found, and defendants practically concede that the date was erroneous, and should have been July 9 as the listing was for a six months' period. There is very little conflict in the evidence. It is the legal conclusions therefrom on which the parties disagree.

Carlson showed the property a number of times prior to May 23, and had received an inquiry concerning it from one Albert J. Bernard. On that date Carlson described the property to Bernard, who expressed an interest in it. Carlson made an appointment with Bernard to show him the property on May 29. Carlson advised defendant Henry Roppolo that he would bring a prospect to the property on that date. Bernard was late for the appointment and when he and Carlson arrived, Henry had left. That afternoon Carlson contacted Henry and said that he had made an appointment for Henry to show the prospect around the ranch on June 7. Bernard on June 3 changed this appointment to June 10. On June 5 Carlson informed Henry of the new date and for the first time gave him the name of the prospect, Bernard.

On June 10 Bernard went directly to the property and was shown over it by Henry in a jeep. Carlson, after waiting at his office for Bernard, went to the ranch and saw Bernard's car there but did not see the men. Later that day at Carlson's office Bernard expressed to Carlson his interest in the ranch and discussed the possibility of trading some Malibu property for it. On June 21, Bernard wrote Carlson offering to trade the Malibu ranch for the Roppolo ranch. Carlson submitted the offer to defendants who between June 21 and July 4 went to Malibu and examined the property. On returning, defendants rejected the offer. From time to time Carlson asked defendants for an extension of the listing, which defendants refused to give. On June 28, they did give a 30-day listing, limited, however, to the possible purchase by one McDanial.

In the meantime, before the expiration of the general listing and in late June, Henry at Bernard's direction went to the office of Ward Dawson, secretary of the Inventor's Sales

and Advertising Corporation in San Francisco, a corporation in which Bernard was interested, to discuss and negotiate concerning the sale of the ranch. About that time Bernard informed Henry that title to the property would be taken in said corporation's name. Shortly after July 4, Henry notified plaintiff that he had sold the ranch to somebody who "just knocked on the door." From the time Henry went to Dawson's office Henry continued to deal directly with either Bernard or Dawson, and at some time prior to July 9 met Bernard and Dawson in a San Francisco hotel at which time it was agreed that the corporation would buy the property at $66,000. In late June, Dawson informed Henry that the corporation would buy the ranch. In June Henry rejected the offer for the property by one Matthews, telling him that he had sold the property. Henry testified that thereby he was referring to the sale to the corporation. On July 9 Dawson on behalf of the corporation wrote defendants offering to buy the ranch for $66,000 on terms therein listed. These terms varied from those set forth in the listing agreement in two respects. First, the listing agreement provided for a down payment of 29 per cent of the purchase price. The letter offered an immediate payment of $1,000 cash and the balance of the sum necessary to equal 29 per cent of the purchase price to be paid when the corporation's Malibu property was sold or no later than December 1. Secondly, the listing agreement provided that the balance of the purchase price "amor[t]ize in 10 yrs." The offer was that the balance be paid in installments of $5,000 or more including interest. This would require approximately 15 years to amortize if only $5,000 per year were paid.

On July 17 the corporation wrote defendants: "Even though there are certain details to be worked out as concerns your desire to minimize taxes . . . this corporation desires to bind this purchase, subject to working out details." It then stated that there was enclosed a check for $1,000 "which represents the agreed deposit as against the purchase price, pending opening of escrow and closing of same December 1, 1956. In our discussion, it was agreed that the terms of our letter of July 9, 1956 are substantially correct, however, the method of payment of the balance of $65,000 is to be decided upon with due regard to your tax situation . . . . You understand that by accepting this check you are committing yourself to a sale to this corporation at the $66,000 figure with only the terms to be worked out." The letter stated that an escrow was to be opened within two weeks, and an additional $1,000 paid. The

letter requested that defendants sign the copy of the letter on the line under "Accepted." Henry did so and defendants accepted the check. July 31, the corporation addressed a letter to a title company, giving the terms of the sale as in the July 9 letter, and appointing it escrow agent to handle the transaction. At the same time the corporation paid into escrow an additional $1,000. Defendants objected to the down payment stated in the July 31 letter. From then until March 1957, when the escrow was closed and the sale completed, defendants and the corporation were negotiating over the payment of the balance of the purchase price, the settling of certain water rights and certain areas to be retained by defendants, and the question of the buyers' defense of threatened litigation over a broker's commission by one Matthews.

The title went to the corporation and thereafter was transferred to Bernard and one Curcuruto. Bernard testified that between 30 to 60 days after he first started to negotiate with Henry, Dawson ceased to be his partner and Curcuruto took his place, and that it was Bernard and Cucuruto who were buying the property rather than the corporation. The entire purchase price paid defendants was from moneys of Bernard and Curcuruto.

### Plaintiff Produced the Buyer

"A broker is entitled to his commission for effecting a sale of real or personal property only when it affirmatively appears that the purchaser, as the result of the broker's efforts, was induced to buy the property, or that a prospective purchaser was ready, able and willing to buy upon the terms and at the price specified by the owner." (*Cone* v. *Keil* (1912) 18 Cal.App. 675, 679 [124 P. 548] ; see *Gunn* v. *Bank of California* (1893) 99 Cal. 349, 353 [33 P. 1105].)

There can be no doubt but that plaintiff within the time specified in the listing agreement brought the purchaser and the seller together, and that the purchaser was ready, able and willing to buy on terms satisfactory to the seller, even though those exact terms were not completely arrived at during the term of the listing agreement. It is clear, too, that Henry, either in an attempt to avoid paying plaintiff a commission or because he preferred to deal directly with the purchaser, took out of plaintiff's hands, during the listing period, all negotiating with the purchaser. To deny plaintiff a commission under the circumstances of this case would be inequitable and unfair. Dawson, representing both Bernard and the corporation in whose name the title was to be taken,

informed Henry that the corporation would buy the ranch, the terms to be agreed upon. Henry agreed to sell upon that basis. ▇ Where the real estate broker brings the seller and buyer together and the negotiations continue beyond the expiration date of the commission agreement, the broker is still entitled to his commission. Particularly is this so in a situation like this where the seller takes the negotiating away from the broker and conceals that fact by stating that he had sold the ranch to somebody who ''just knocked on the door.''

As said in *Oaks* v. *Brahs* (1955) 132 Cal.App.2d 182 [281 P.2d 562], in a situation somewhat similar to that in our case in that the seller negotiated directly with the buyer procured by the broker, ''Upon the sale being consummated, even though the final consummation resulted from negotiations directly between the buyer and seller, the commission had been earned and must be paid.'' (P. 184; see *Palmtag* v. *Danielson* (1947) 30 Cal.2d 517, 521 [183 P.2d 265].)

▇ The fact that in negotiating on his own behalf the owner changed the terms from those in the listing agreement does not make the broker any the less the procuring agent for the sale nor give the owner an excuse for not paying the broker who brought him and the purchaser together.

▇ ''Ordinarily, the price at which a broker is authorized to sell property is considered merely an asking price to guide the broker in his negotiations with the prospective purchasers. . . . If the broker procures a purchaser willing to pay a lower price, the owner cannot deprive the broker of his commission by conducting the final negotiations himself and selling at a lower figure to the purchaser procured by the broker.'' (*Palmtag* v. *Danielson, supra,* 30 Cal.2d at p. 521; see *Filante* v. *Kikendall* (1955) 134 Cal.App.2d 695, 701 [286 P.2d 448].)

▇ Here, the price offered by the buyer and accepted by defendants was not lower than that in the listing agreement. The terms of payment offered and accepted, however, were somewhat different. As said in *Twogood* v. *Monnette* (1923) 191 Cal. 103, 108 [215 P. 542], ''the modification of the terms having thus been agreed to by the seller, this departure from the terms of the agent's authorization affords no ground for refusal to pay him his commission.''

''[A] change made by the owner, when consummating the sale, in the price of the land or the terms of the sale from those specified in the brokers' contract cannot of itself affect or impair in any way the right of the broker to his commissions.'' (*Bail* v. *Glantz* (1926) 78 Cal.App. 49, 56 [248 P. 258].)

*Born* v. *Koop* (1962) 200 Cal.App.2d 519 [19 Cal.Rptr. 379], denying a real estate broker a commission upon the ground that the offer to buy made by the purchaser varied from the terms expressed in the broker's authorization to sell, is not applicable, in that there the sellers did not, as did the sellers here, accept the offer to buy.

It is clear from the evidence that the June 9 date was an error and that the parties intended the listing to be for what the agreement said, six months. The mere fact that in June plaintiff asked for an extension and received a limited listing in nowise contradicts this fact. Obviously, as the listing was drawing to a close, plaintiff was trying to get an extension before the listing expired. Nor, as contended by defendants, does the fact that Carlson did not report to Bernard that defendants were not willing to accept Bernard's Malibu ranch constitute evidence that plaintiff considered the open listing revoked or that plaintiff abandoned the agency. Carlson testified that he had attempted to contact Bernard but was unable to reach him. After Henry told Carlson he had sold the property Carlson stopped trying to reach Bernard.

█ While the listing agreement did not grant plaintiff an exclusive agency, it could not be revoked after plaintiff had performed under it. (See *Tetrick* v. *Sloan* (1959) 170 Cal. App.2d 540, 546-547 [339 P.2d 613].)

█ Defendants contend that the offer made in the meetings between Henry, Bernard and Dawson and embodied in the letter of July 9 was procured by Henry's efforts and not by those of plaintiff. Nevertheless, plaintiff was the procuring cause. It is conceded that Carlson brought Bernard to Henry's attention. From the time Bernard heard through Carlson of the property he was interested in purchasing it. He negotiated through Carlson until Carlson ceased to act after being misled by Henry into thinking that the property had been sold to another. Henry told Bernard in June that the listing had expired. The disruption of Carlson's efforts was caused by Henry. Though Bernard thereafter dealt with Henry, there is no evidence that Bernard's interest in the property lagged and was rekindled by Henry. As pointed out in an excellent article, *The Right of a Real Estate Broker to a Commission in California* in 8 U.C.L.A. Law Review (1961) page 152, the thrust of the inquiry in an action of this kind is to determine whether the broker was the one who produced the buyer. The delay in closing the sale until after the time limited in the contract was for the purpose of enabling defendants to work

out some terms beneficial to them from a tax standpoint. In *De la Questa* v. *Armstrong Holdings Co.* (1920) 48 Cal.App. 487, 493 [192 P. 135], the court said: "The delay in closing the sale, until after the time limited by the contract, was caused by the desire of the defendant to procure more satisfactory terms, and does not destroy plaintiff's right to his commission. [Citation.] The purchaser was found, and negotiations were begun within the time limit. It is immaterial that they were not fully consummated until afterward. [Citation.]"

*Love* v. *Gulyas* (1948) 87 Cal.App.2d 608 [197 P.2d 405], has no application here for the reason that in that case the seller had no knowledge of the connection between the principal and the agent whom the broker produced. For all appearances the principal was newly arrived on the scene long after the broker's listing had expired. Nor is *Nelson* v. *Mayer* (1954) 122 Cal.App.2d 438 [265 P.2d 52], in point, as the sale was negotiated through an entirely separate real estate office than that of the plaintiff. The plaintiff was not, as was the plaintiff in the instant case, the procuring cause of the sale.

The evidence supports an inference that the corporation was merely an instrument of Bernard. Dawson and he were partners, Dawson being later succeeded as a partner by Curcuruto. The evidence is replete with the activity, interest and direction of Bernard throughout. Finally there is the ultimate transfer of title to Bernard and his then partner, Curcuruto. Thus the sale to the corporation was nevertheless a sale to a buyer produced by plaintiff.

The agreement contained a so-called "safety clause" providing for payment of the commission "if sold or exchanged within 90 days after the termination of his contract to anyone with whom said agent had negotiations during the term hereof, provided that I have had knowledge . . . within five (5) days following the contract termination."

If there is any doubt as to the fact that the sale was agreed upon between the seller and purchaser prior to the expiration of the listing agreement on July 9, there can be no doubt that the sale took place within 90 days thereafter. The letters of July 9 and 17, the latter accepted by defendants, which constituted an enforceable agreement, the opening of the title company escrow and *the acceptance by defendants of the part payment of $1,000,* all took place well within that period.

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.