STONE, J.
 

 Plaintiff obtained a judgment for a real estate commission in the sum of $7,200, for the sale of defendants’ property. On March 6, 1961, defendants gave plaintiff an open, nonexclusive listing to sell their 105-acre ranch in Merced County for $88,950, with a down payment of $40,000. The agreement provided for a 10 percent commission. The listing was for three years, unless sooner terminated by the sellers upon 30-days’ written notice. The agreement also provided: ‘1 However, if within one year after the termination date of this Agreement, I sell or transfer this property to a prospect procured by you prior to its termination, I shall pay you your commission. ’ ’
 

 On March 21, 1963, the parties entered into a “Price Change and Reactivation” agreement, reducing the sale price to $80,000 and the down payment to $20,000, the equipment to be sold separately for $5,000 with no commission to be paid thereon, the buyer to assume an existing first trust deed of $21,820 at 3% percent interest.
 

 Plaintiff advertised the property for sale in its catalogue, in Los Angeles and San Francisco newspapers, and mailed special brochures to its clients.
 

 In October or November 1962, James and Lucille Edgemon, in response to an advertisement in one of plaintiff’s catalogues, called at plaintiff’s Turlock office and talked with its manager, Harold Crocker, about the property. Crocker
 
 *252
 
 took them to the ranch, introduced them to defendants, and a purchase was discussed.
 

 The record is replete with testimony by defendant owners, by Crocker, the broker, and by James and Lucille Edgemon as to many subsequent visits to the property by James and Lucille, and of their discussions about buying the ranch. James and Lucille wanted the property from the outset, but they encountered difficulty in arranging for financing.
 

 On May 6 or 7, James telephoned Crocker at his home to inquire whether he would be in his office the following Monday. James told him that they wanted to come over and close the deal, adding, ‘ ‘ I have the financing. ’ ’ Crocker never saw James again, nor did he talk with him after the telephone call. On May 7, defendant owners notified Crocker’s company that the 1961 open listing agreement and the 1963 price revision and reactivation agreement were cancelled effective in 30 days.
 

 In August, defendants called at the home of James and Lucille in San Jose, and offered the ranch to them, with the equipment, at the reduced price of $77,000 and a down payment of $15,000. The apparent explanation for the lowered price and down payment was that the listing with plaintiff had expired and they could deal direct.
 

 James and Lucille took his brother, Davis Edgemon, and his wife, Dorothy, to the ranch two or three times after defendants visited them in San Jose. As to his discussions with his brother about the ranch, James testified: “Well, when we were having difficulty getting the financing, it involved some borrowing on a ten percent basis, I talked to my brother about helping me buy the place. And he said that he could probably raise the money, but he wouldn’t want to just loan it to me outright because there was a lot of money involved and a certain amount of risk involved. So he said that he would purchase the ranch from Chet and Ruth Lewis and at such time as we could make arrangements to buy the ranch, afford to buy it, well, he would be willing to sell it to us.”
 

 This conversation took place at the ranch, and Mr. Lewis was present during portions of the discussion.
 

 By way of deposition, Mrs. Lucille Edgemon related that the understanding was “That Bill [Davis Edgemon] was loaning us this money and that we would pay him back and the ranch would be ours at seven percent interest we were to pay him, plus any expenses involved. ’ ’
 

 
 *253
 
 In testifying, Davis Edgemon was somewhat evasive as to the exact terms of the agreement, but he responded to questioning by the trial judge, as follows:
 

 ‘1 The Court : . . . Mr. Edgemon, did you prior to the purchase of this property have any discussions with your brother, James, the net effect of which was an understanding that while you were buying this property your brother could purchase it from you at some time in the future ?
 

 The Witness : I did.
 

 “The Court: When he was able to handle the finances?
 

 The Witness : When he could. Yes.
 

 “The Court: And was that understanding that he could buy it at the same price which you paid for the property or was it merely that he could meet a price offered for the property ?
 

 The Witness : It would be the same price.
 

 ‘ ‘ The Court : The same price as you paid ?
 

 The Witness: Yes, sir, plus the 7 per cent.
 

 “The Court: You used an expression a moment ago that he would have an opportunity of buying it, which would suggest that if he could meet the highest and best offer made by, for the property, then he could buy it. That was not the understanding ?
 

 The Witness: No. He’d have an opportunity to buy it at the same price I paid for it.
 

 “The Court : And in your mind at the present time do you feel an obligation to sell this property to your brother at any time that he can come up with the price that you paid plus 7 per cent of the money that you put out ?
 

 The Witness : Yes, sir.’’
 

 Davis and his wife purchased the ranch property from defendants for $72,000 with a down payment of $15,000; they also purchased the equipment for $5,000. On October 7, 1963, a deed was recorded which reflected Davis and Dorothy Edgemon as grantees. However, Davis and Dorothy never entered into possession; it was James and his wife who took possession and placed their manager in charge of the ranch. James pays Davis 7 percent on the $15,000 down payment that Davis supplied, he makes the payments on the promissory note evidencing the balance of the purchase price, and he is paying for the equipment. James also pays all operating expenses and is entitled to all profits.
 

 
 *254
 
 On this evidence, the trial court found that plaintiff “was the primary procuring cause, and the predominate effective cause of the sale of the hereinabove mentioned real property. ’ ’ Whether there is substantial evidence to support the foregoing finding is the sole question on this appeal. Both parties argue at some length whether there was a joint venture, whether the agreement between Davis and defendants could be enforced against James and Lucille and whether James and Lucille could enforce the purchase agreement against defendants. We believe these issues are irrelevant; the crux of the case is whether plaintiff can be said to be the “procuring cause” of the sale by reason of the initial contact with James and Lucille, by arousing their interest in the property through its advertising material, by introducing James and Lucille to defendant owners, and by the many conversations with and services rendered to the Davises by plaintiff’s agent.
 

 Whether plaintiff was the “procuring cause” presents a question of fact
 
 (Sessions
 
 v.
 
 Pacific Improv. Co.,
 
 57 Cal.App. 1, 18 [206 P. 653]) and the evidence must be viewed in the light most favorable to plaintiff.
 
 (Berniker
 
 v.
 
 Berniker,
 
 30 Cal.2d 439, 444 [182 P.2d 557].)
 

 Defendants argue that plaintiff procured James as a prospective buyer, who was unable to buy, and negotiations with James constituted a separate transaction from the negotiations with Davis, to whom they ultimately sold the property.
 

 It is immaterial that defendants themselves consummated the sale. A number of cases hold that where a broker procures a buyer he is entitled to his commission even though final negotiations are between the buyer and the seller.
 
 (Oaks
 
 v.
 
 Brahs,
 
 132 Cal.App.2d 182 [281 P.2d 562] ;
 
 Wilson
 
 v.
 
 Roppolo,
 
 207 Cal.App.2d 276, 281 [24 Cal.Rptr. 437].) James Bdgemon brought his brother and the sellers together, and his activities led directly to the ultimate sale to his brother, Davis. It is also significant that although the property was purchased in the names of Davis and Dorothy, it is apparent their title was primarily for purposes of security. James testified that he and his wife were having difficulty arranging the financing, that he negotiated with his brother, Davis, who “said that he would purchase the ranch from Chet and Ruth Lewis and at such time as we could make arrangements to buy the ranch, afford to buy it, well, he would be willing to sell it to us. ”
 

 
 *255
 
 The evidence supports the inference that Davis bought the property because of his brother, James, and that he bought it for the benefit of James. Davis furnished the down payment but never took possession; on the other hand, James and his wife took possession and they have held possession ever since. Moreover, they are making all payments on account of the purchase price, they farm the property, pay all of the expenses and keep all of the profits; they neither pay rent nor share the profits with Davis.
 

 In
 
 Wilson
 
 v.
 
 Roppolo, supra,
 
 207 Cal.App.2d 276, a broker interested one Bernard in the purchase of ranch property. The parties negotiated but were unable to arrive at an agreement. Thereafter a corporation in which Bernard was interested purchased the property from the owner, and the corporation agreed with Bernard that he might buy the property, or at least an interest therein, at a later date. As in the case before us, the sale was consummated after the listing agreement expired and some of the terms of sale varied from the listing. However, in
 
 Wilson
 
 the court had no difficulty in finding that the broker who interested Bernard in the property was the procuring cause since Bernard interested the corporation in the property and the owner sold direct to the corporation.
 

 Of interest is
 
 Sessions
 
 v.
 
 Pacific Improv. Co., supra, 57
 
 Cal.App. 1. There an agent was authorized to sell unimproved shoreline property. He mapped the property and devised a plan for its development. After doing the development work he interested a prospective buyer in the property, but no sale was consummated. After his agreement with the owner expired, the property was sold primarily because the preliminary planning and development work of the agent had attracted the attention of the ultimate buyer to the property. In upholding the right of the agent to a commission, the court said, at page 18: “So when the broker is in fact the primary procuring cause, the law will not deprive him of his commission because the negotiations were completed through someone else, and even perhaps without the broker having himself met or communicated personally with the buyer. As it is sometimes put in homely phrase in such eases, ‘He who shakes the tree is the one to gather the fruit. ’ ”
 

 We conclude that the trial court’s finding that plaintiff “was the primary procuring cause, and the predominate
 
 *256
 
 effective cause of the sale,” is supported by substantial evidence.
 

 The judgment is affirmed.
 

 Conley, P. J., and Gargano, J., concurred.
 

 A petition for a rehearing was denied November 16, 1967.