Filed 1/14/14  Prahm v. Pickford Real Estate CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| OLE PRAHM, | D062477 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2010-00056983-CU-BC-NC) |
| PICKFORD REAL ESTATE, INC., | |
| Defendant and Respondent. | MODIFICATION ORDER |
| | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 8, 2014, be modified as

follows:

Footnote 2 on page 2 is removed as filed and replaced so that the footnote now

reads:

"The California Association of Realtors (CAR), a voluntary trade association that develops and publishes standard forms and publications for the real estate industry (2 Miller & Starr, Cal. Real Estate (3d ed. 2010) § 4:54, pp. 4-187), applied for leave to file an amicus brief, which in part urges this court to clarify the proper application of CAR "procuring cause guidelines."  This court issued an order stating we would consider the application with this appeal.  We exercise our discretion to deny CAR's request.  (*Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 957, fn. 2.)  As Prudential concedes, the procuring

cause guidelines, which are intended to assist arbitration panelists, are not binding on courts. (See, e.g., *Solano v. Superior Court* (2009) 169 Cal.App.4th 1361, 1371-1372 [California District Attorney Association implementation guidelines for Proposition 21 "are not authoritative or binding as precedent on the courts."].)

**There is no change in judgment**.

NARES, Acting P. J.

Copies to: All parties

2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| OLE PRAHM,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>PICKFORD REAL ESTATE, INC.,<br><br>    Defendant and Respondent. | D062477<br><br><br><br>(Super. Ct. No. 37-2010-00056983-<br>CU-BC-NC) |

APPEALS from a judgment of the Superior Court of San Diego County, Thomas P. Nugent, Judge.  Reversed and remanded with directions.

Burkhardt & Larson and Philip Burkhardt for Plaintiff and Appellant.

Rheinheimer Smigliani Drake and Jane Rheinheimer, Elizabeth Drake for Defendant and Respondent.

Following a bench trial on plaintiff and appellant Ole Prahm's complaint for recovery of a real estate broker's commission, the trial court found Prahm was the

procuring cause of the sales transaction and awarded him $120,210 in damages, constituting one-half of the commission received by defendant and respondent Pickford Real Estate, Inc., doing business as Prudential California Realty (Prudential). The court also awarded Prahm prejudgment interest from the date of the filing of his complaint under Civil Code[1] section 3287, subdivision (b).

Prahm appeals, contending the court erred by (1) failing to award him the full $247,225 commission due him under Multiple Listing Service (MLS) rules and pursuant to section 3302 and (2) computing prejudgment interest from the date of the filing of his complaint, rather than from December 31, 2007, the date escrow closed and Prahm's commission was to be paid. He argues his success on either of these contentions will entitle him to recover an additional $13,134.70 in expert witness fees under Code of Civil Procedure section 998.

Prudential cross-appeals. It contends the court erred by awarding Prahm prejudgment interest from the date Prahm filed his complaint. It also contends there is no substantial evidence to support the court's finding that Prahm was the procuring cause of the sales transaction.[2]

---

[1] Statutory references are to the Civil Code unless otherwise specified.

[2] The California Association of Realtors (CAR), a voluntary trade association that develops and publishes standard forms and publications for the real estate industry (2 Miller & Starr, Cal. Real Estate (3d ed. 2010) § 4:54, p. 4-187), applied for leave to file an amicus brief, which in part urges this court to clarify the proper application of CAR "procuring cause guidelines." We issued an order stating we would consider the application with this appeal. Under California Rules of Court, rule 8.200, a party must apply for permission to file such a brief "[w]ithin 14 days after the last appellant's reply

We conclude substantial evidence supports the court's finding that Prahm was the procuring cause of the sales transaction at issue and entitled to a commission, but the evidence does not support its findings as to Prahm's damages because his entitlement to a 2.5 percent commission was fixed by Prudential's MLS listing, and there is no evidence the parties' entered into an enforceable modification of that listing. We further conclude Prahm is entitled to prejudgment interest as a matter of law on the commission amount, which was payable to him upon the close of escrow on December 31, 2007. We lack jurisdiction as to Prahm's challenge pertaining to his Code of Civil Procedure section 998 pretrial offer to compromise. Accordingly, we reverse the judgment and direct the trial court to enter a new judgment described below.

## FACTUAL AND PROCEDURAL BACKGROUND

Some of the background facts are taken from the parties' stipulated facts within their joint trial readiness conference report, and from the trial court's statement of decision. Because the court found in Prahm's favor on the procuring cause issue, we view the evidence supporting its finding in the light most favorable to Prahm.

---

brief is filed or could have been filed under rule 8.212, whichever is earlier . . . ." (Cal. Rules of Court, rule 8.200(c).) CAR's filing was late under this rule, as the cross-appellant's reply brief was filed on August 12, 2013, and CAR's application was filed 15 days later on August 27, 2013. We deny CAR's request as untimely. We note that even if the application was timely filed, we would exercise our discretion to deny it. (*Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 957, fn. 2.)

Prahm is a licensed real estate salesperson under California law and a subscriber to the MLS.[3] In 2006 and 2007, Prahm was an agent of Coldwell Banker, an MLS broker participant. Prudential is a real estate broker licensed under California law and a broker participant with the MLS.

In August 2006, Prudential entered into a written listing agreement with Donald Sammis in his capacity as a limited partner of a partnership, in which Sammis agreed to list real property in Rancho Santa Fe, California (the Sammis property or the property) with Prudential at a list price of between $15,750,000 and $17,750,000, under terms specified in the agreement. The California Association of Realtors form agreement, labeled an "Exclusive Authorization and Right to Sell," states in part, "Seller has been advised of Broker's policy regarding cooperation with, and the amount of compensation offered to, other brokers . . . by offering MLS Brokers: . . . 2.500 percent of the purchase price . . . ."

That same month, Prahm received an email from a family friend who informed him that her cousin who lived on the East Coast, Janice Joerger, wanted to look at houses in the Rancho Santa Fe area of San Diego for potential purchase. The next day, Prahm telephoned Janice Joerger and she emailed Prahm her contact information. Prahm began taking steps to locate properties within the Joergers' parameters of style, privacy and

---

[3]     Section 1087 provides in part: "A multiple listing service is a facility of cooperation of agents and appraisers, operating through an intermediary which does not itself act as an agent or appraiser, through which agents establish express or implied legal relationships with respect to listed properties, or which may be used by agents and appraisers, pursuant to the rules of the service, to prepare market evaluations and appraisals of real property."

views, starting with about 70 homes and narrowing it down to about 36. During the rest of the month and into October, Prahm communicated about nine times with the Joergers via their joint email address concerning several houses in the area and general information about Rancho Santa Fe.

In October 2006, Prudential filed Sammis's property with the MLS and by doing so made a unilateral, contractual offer of compensation to other MLS broker participants for their services in selling the property. Consistent with the listing agreement, the MLS listing filed by Prudential specifies the compensation to the buyer's agent as 2.5 percent of the gross selling price.

In March 2007, Prahm met with Janice Joerger to discuss the properties she wanted to see. He brought several property listings, including for the Sammis property, which he placed first on his list. Prahm felt the Sammis property had all of the qualities the Joergers wanted in a house. He printed out the MLS listing for the property, and made notes on it related to his upcoming March 16, 2007 showing. He also contacted Kathleen Hawkes, Sammis's selling agent with Prudential, and told her he wanted to show the property to a prospective purchaser who he had prequalified for his financial ability to purchase a house of that value. Prahm and Janice Joerger met on March 16, 2007, and toured the Sammis house and other houses. Janice Joerger was impressed with the Sammis property and felt it had everything they were looking for. By early April, Kurt Joerger had arrived in San Diego, so Prahm emailed Hawkes to schedule another viewing of the Sammis property and communicated with the Joergers regarding the schedule.

On April 12, 2007, Prahm and the Joergers toured several houses, arriving last at the Sammis property. According to Prahm, they parked separately in the circular driveway and for about 45 minutes walked through the house room by room, through the garage to a guest house. The Joergers asked Prahm how to develop the property in view of the fact it was on two legal parcels, and inquired about the presence of easements, the homeowners association, remodeling, and the size of the master living room. Kurt Joerger had asked Prahm about the development potential for the property, and so Prahm conducted some research with the homeowners association manager and sent a lengthy email to the Joergers with information from the association, telling them the lot could not be split and giving them information about the history of lot split attempts, the driveway, and an open field on the property. Given his conclusion that the property constituted only one legal lot, Prahm related that he had estimated its value at no more than $10 million.

After that meeting, Prahm and the Joergers exchanged emails about properties other than the Sammis property. On April 19, 2007, Prahm emailed the Joergers about his opinion on the value of the Sammis property, and sought feedback from them about what they had seen. Kurt Joerger responded by telling Prahm that the Sammis property was "all positive," and "the only real contender"; his only perceived problems with the property were road noise, renovation and total cost; and the other properties did not meet his expectations. During April 2007, Prahm continued to look for properties at Kurt Joerger's request, and he scheduled appointments for other homes as well as the Sammis property during high traffic times. On or about April 24, 2007, they went to the Sammis

6

property and assessed the view and road noise. Thereafter, Prahm advised Hawkes that the Joergers were still interested in the property.

In early May 2007, Prahm prepared a residential purchase agreement for the Sammis property at a purchase price of $11,750,000, a number the Joergers had asked Prahm if Sammis might be willing to accept. Prahm did not present the offer to the Joergers; he prepared it for his file so he would be ready in the event they became willing to make an offer. During May 2007, Prahm continued email communications with the Joergers concerning drawings they had asked him to provide on the Sammis property and another property, and about finding rental housing in Rancho Santa Fe. Kurt Joerger thanked Prahm for his time and patience, and told Prahm he had appreciated speaking directly with Mr. Sammis. Prahm also continued to show the Joergers properties in areas surrounding Rancho Santa Fe. In late May 2007, Prahm sent the Joergers a sample residential purchase contract and discussed an exclusive buyer-broker agreement. Because Prahm was planning a trip out of the country, he also prepared a real estate agency relationship disclosure form so that he would have the paperwork executed before he left.

On June 18, 2007, while Prahm was away, Kurt Joerger sent a letter of intent on the Sammis property to Cathy Gilchrist, another agent working with Hawkes, offering $10,000,000 subject to acceptable financing. Joerger added a postscript on his email to Gilchrist stating, "I will copy [Prahm] on this upon his return." When Prahm returned from his trip in mid-June 2007, he was surprised to learn about Joerger's offer. On June 23, 2007, Kurt Joerger emailed Prahm, welcomed him back, and acknowledged Prahm

and Sammis's agents would be communicating. Prahm understood the Joergers were trying to get a deal focused on a $10 million price. Joerger told Prahm that the Joergers' offer expired the next day, and Joerger in fact withdrew the offer on June 24, 2007.

On June 25, 2007, Prahm emailed a counter offer from Mr. Sammis to the Joergers for a purchase price of $10,750,000 net of commissions, and Kurt Joerger responded by faxing Prahm two pages of calculations regarding the property values. Prahm wrote everything down verbatim and transmitted it to Hawkes and Gilchrist. On June 28, 2007, at Kurt Joerger's request, Prahm then met with the agents to try to "work out a deal," including by cutting commissions. According to Prahm, at the end of the meeting, it was agreed Sammis would possibly accept $10,495,000 if both Prudential and Coldwell would agree to reduce their commission from 2.5 to 2 percent. Prahm told Hawkes and Gilchrist he would need approval from his Coldwell manager to do that. He expected to hear back from the agents as to whether Sammis would approve a purchase price of $10,495.000.

Prahm attempted to contact Sammis's agents on or about July 9, 2007, to follow up on the matter, but got no response. Thereafter, Prahm picked up a voice message left by Kurt Joerger on July 5, 2007. In that message, Joerger suggested that Prahm had asked the Joergers to put an offer on a home Kurt Joerger had never seen, complained that Prahm did not have the inside real estate connections that he had expected, and told Prahm not to "interject" himself into or discuss any real estate transaction or business dealing involving the Joergers in San Diego.

8

In mid July 2007, Prahm put Sammis, Hawkes and Gilchrist on notice that he had brought the Joergers to them and was instrumental in their transaction. Joerger responded by threatening to hold Prahm and Coldwell Banker responsible for any losses or damages incurred because of Prahm's "interference." Kurt Joerger's communications "dumbfounded" Prahm; he could not understand why his client would turn against him. Prahm had no further contact with the Joergers, and Prudential's listing expired in September 2007.

In January 2008, Prahm was informed by another agent that the Sammis property had been sold, but when Prahm checked, the MLS report showed the listing had expired. Days later, the listing for the property was changed to "active" status, indicating it had not sold. When Prahm inspected county property records, he learned that on December 31, 2007, the Joergers had purchased the property from Sammis for $9,889,000. The closing statement indicates the Joergers paid Prudential a $240,420 commission.

After Coldwell Banker assigned its claims for recovery of commissions to Prahm, he sued it and Prudential, asserting causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and for the "reasonable value of his services."

The matter proceeded to a bench trial, during which both parties introduced expert testimony on the issue of whether Prahm was the "procuring cause" of the

Joerger/Sammis transaction, and the relevance of MLS rules on the question.[4] Prahm's expert, Frank DiLauro, testified that the MLS rules protected the buyer's agent, and that, in order to fulfill their requirements, a written signed offer did not need to be submitted at the time the procuring agent was involved in the transaction. Using the MLS rules as well as trade industry guidelines for assistance, and asserting the Joergers presented their letter of intent as a result of Prahm's negotiations, DiLauro testified Prahm was the procuring cause of the transaction. Prudential's expert Ludlow Keeney agreed that the MLS rules, particularly rules 7.12 and 7.13, defined the relationship between Prudential as the listing broker and Coldwell Banker as the cooperating broker.[5] However, he testified the Joergers "procured themselves" as the buyers with the assistance of their attorney.

Prudential also presented testimony from Hawkes and Gilchrist about their June 28, 2007 meeting with Prahm. Gilchrist testified she had set up the meeting and that, knowing Prahm had shown the property to the Joergers, it was the agents' intent to

---

[4]     The MLS rules were a trial exhibit but they do not appear in the record. They are online on Sandicor, Inc.'s website at <http://www.sandicor.com/ rules-regulations/Sandicor-Rules-and-Regulations-Document.pdf>, as of November 12, 2013.

[5]     MLS rule 4.9 defines a cooperating broker, for purpose of the MLS rules, in part as "a broker participant who is also a selling agent as defined in Civil Code Section 1086 who acts in cooperation with a listing broker to accept the offer of compensation and/or subagency to find or obtain a buyer or lessee. The cooperating broker or selling broker may be the agent of the buyer or, if subagency is offered and accepted, may be the agent of the seller." Section 1086 defines a "selling agent" as "an agent participant in a multiple listing service who acts in cooperation with a listing agent and who sells, or finds and obtains a buyer for, the property." (Civ. Code, § 1086, subd. (h).)

discuss what they could do to make the deal work. According to Gilchrist, they discussed "possibly reducing our commissions to get us closer to meeting of the minds." Hawkes testified that at the meeting she, Gilchrist and Prahm "all agreed we would reduce our commission."

Thereafter, the trial court issued a proposed statement of decision. Summarizing the facts and discussing the MLS rules on which the experts relied, the court ruled that under the circumstances, Prahm was the procuring cause of the transaction and entitled to the commission on the Sammis property. The court then addressed the legal effect of Prudential's decision to accept a commission different from the 2.5 percent commission provided in its listing agreement. Reasoning that the parties had agreed to reduce and share equally in the commission, which ultimately became a lump sum, it awarded Prahm one-half of the gross commission reduced by the cost of a survey paid by Prudential.

Prahm objected to the court's proposed statement of decision, challenging the factual and legal basis for several of its conclusions.[6] Thereafter, the trial court issued its

---

[6] In his opening brief, Prahm does not identify any material issues or ultimate facts left unaddressed by the court's final statement of decision, nor does he address the effect, if any, of his objections on our appellate review. " ' "The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." ' " (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1314, fn. 12.) The trial court is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case. (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736-737, fn. 15.) Though Prahm objected to both the legal and factual bases of the trial court's decision, he has not given us any basis to conclude the statement of decision did not sufficiently address the ultimate facts and material issues. Prudential did not object to the court's statement of decision. Accordingly, in assessing the parties' contentions, we will imply findings to support the

11

final statement of decision, including detailed findings of fact and modifying its reasoning about the parties' agreement concerning the commission. Finding "[t]he stated reasons for the [Joergers'] termination of Prahm's agency were obviously pretextual" and "not justified," the court again ruled Prahm was the procuring cause of the Joerger/Sammis transaction. Observing that a vested position cannot be unilaterally revoked, it further ruled: "The parties had previously agreed to reduce and share equally in the commission presumably if that is what it would take to close the deal. At the time it was finally agreed to, the listing agents had been directed to no longer communicate with the plaintiff whose position as a procuring cause had vested. Ultimately, the commission took the form of a lump sum; not a percentage of the purchase price. . . . [T]he decision to accept this negotiated sum, undoubtedly necessary to close the deal, had the legal effect of modifying the gross commission proceeds available to the competing parties, and that an equal division of the commission is consistent with their understanding." (Footnote omitted.) The court awarded Prahm $120,210, one half of the commission. It thereafter entered judgment accordingly, providing the parties were to address prejudgment interest by noticed motion.

Prahm moved to vacate the judgment and enter a different judgment, arguing (1) he was entitled to recover the principal sum of $247,225 pursuant to section 3302, the MLS listing, and MLS rules and (2) the trial court should have awarded him prejudgment interest under section 3287, subdivision (a) from December 31, 2007, the date of close of

judgment where appropriate. (*Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 292, quoting *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

escrow, or alternatively, if awarded under section 3287, subdivision (b), from the date he filed his complaint.

Ultimately, the trial court denied Prahm's motion to vacate the judgment and denied his request for prejudgment interest under section 3287, subdivision (a). However, it granted Prahm's request for prejudgment interest under section 3287, subdivision (b), awarding Prahm such interest at 10 percent per annum from July 1, 2010, the filing of his complaint.

Prahm filed this appeal, challenging the court's calculation of damages and prejudgment interest, which he asserts impacts his ability to recover expert witness fees as costs. Prudential cross-appeals from the judgment and also the postjudgment order awarding Prahm prejudgment interest. It likewise challenges the court's interest calculation, and its finding that Prahm was the procuring cause of the Joerger/Sammis transaction.

## DISCUSSION

### I. *Standards of Review*

The parties dispute the applicable standards of review. Prahm contends his appeal involves the proper interpretation of "contractual rights which are set forth in writing" and statutes relating to the trial court's awards of damages and prejudgment interest, requiring independent review. He asserts the relevant facts are not in dispute, and that because the court's awards are based on erroneous legal rulings and not conflicting evidence, the substantial evidence rule does not apply.

13

Prudential disagrees, maintaining that each of the trial court rulings Prahm challenges presents a different standard of review. As for computation of Prahm's earned commission, Prudential argues the court made a factual finding as to contract modification based on conflicting evidence, requiring application of the substantial evidence standard of review. It argues the court's award of prejudgment interest presents a question of law, and its denial of Prahm's request for expert witness fees is reviewed for abuse of discretion.

As for Prudential's own appeal, Prudential does not squarely address the relevant standard of review for the court's finding that Prahm was the procuring cause of the transaction. Prahm argues the court made a factual finding that is governed by the substantial evidence standard of review. The parties agree that we review for abuse of discretion the court's calculation of prejudgment interest under section 3287, subdivision (b).

The issues presented in these appeals are interdependent and implicate several standards of review. We set out those review standards briefly here, and more fully below in connection with each argument. The trial court's finding that Prahm was the procuring cause of the transaction, challenged by Prudential, as well as its finding that the parties agreed to modify their agreement and reduce the commission, challenged by Prahm, are both subject to review for substantial evidence as they resolved disputed facts and inferences, and rest on the credibility of witnesses. (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 821, fn. 2, disapproved on other grounds in *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393, fn. 5; *Watson v. Wood Dimension, Inc.*

14

(1989) 209 Cal.App.3d 1359, 1364, fn. 5 [question of which broker was the procuring cause of a sale is one of fact]; *Rancho Santa Fe Assn. v. Dolan-King* (2004) 115 Cal.App.4th 28, 43; *ASP Properties Group v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266; *Weber v. Jorgensen* (1971) 16 Cal.App.3d 74, 81 [whether a written contract has been modified by an executed oral agreement is a question of fact].) If the appeal involves conclusions of law based on factual findings, we review those conclusions of law de novo. (E.g., *ASP Properties Group*, at p. 1266.)

To the extent Prahm's entitlement to a commission or its calculation is dependent on an interpretation of the written MLS listing, such interpretation is one of law for this court to determine anew, unless the interpretation turns on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *ASP Properties Group v. Fard, Inc.*, *supra*, 133 Cal.App.4th at pp. 1266-1267.) Our independent review extends to the interpretation, if any is necessary, of MLS rules or guidelines. (See, e.g., *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 169 & fn. 1 [interpretation of tax collector's interpretative guidelines presents a question of law not requiring the reviewing court's deference].)

Our review of the trial court's award of prejudgment interest is dependent on our determination of whether the trial court correctly found Prahm entitled to damages, and if so, whether those damages are unliquidated (§ 3287, subd. (b)), or certain or capable of being made certain. (§ 3287, subd. (a).) If the relevant facts are undisputed, "we independently review whether and when . . . damages were certain or capable of being made certain by calculation." (*KGM Harvesting County. v. Fresh Network* (1995) 36

15

Cal.App.4th 376, 390-391; see also *Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347 [denial of prejudgment interest under section 3287, subdivision (a) presents a question of law for reviewing court's independent review].)  If the facts are disputed as to whether damages are "liquidated" so as to entitle Prahm to prejudgment interest under that subdivision, we review the court's determination for substantial evidence.  (See generally, *ASP Properties Group v. Fard, Inc.*, *supra*, 133 Cal.App.4th at p. 1266.)

We review for abuse of discretion a court's award of prejudgment interest on unliquidated damages under section 3287, subdivision (b).  (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.*, *supra*, 169 Cal.App.4th at p. 347, fn. 9.)  "A trial court's exercise of discretion will be upheld if it is based on a 'reasoned judgment' and complies with the '. . . legal principles and policies appropriate to the particular matter at issue.' "  (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815.)

II.  *Prudential's Appeal of the Trial Court's Procuring Cause Finding*

A.  *Legal Principles Regarding a Broker as a Procuring Cause*

" 'A broker is the "procuring cause" of a . . . transaction if he finds a purchaser who is ready, willing, and able to buy the property on the terms stated and he obtains a valid contract obligating the purchaser on these terms.  If the broker cannot secure a written offer from the purchaser, he is still considered the "procuring cause" if he brings the principal and the purchaser together so that they may enter into such a contract.  In other words, if the broker's efforts result in a "meeting of the minds" between the buyer and the seller but the final negotiations and the conclusion of the sale are conducted by

16

them without the aid of the broker, he will still earn his commission.' " (*Buckaloo v. Johnson*, *supra*, 14 Cal.3d at p. 820, fn. 2.) Evidence that a broker merely called the attention of a prospective purchaser to property and urged the desirability of purchase, however, is not sufficient to support recovery of a commission. (See *Hill v. Knight* (1930) 209 Cal. 14, 25; accord, *Fitzpatrick v. Underwood* (1941) 17 Cal.2d 722, 725-726, 729-733 [evidence supported finding that real estate broker was not "efficient" cause of the sale where he informed a purchaser the property was for sale and exhibited it to him; the purchaser and seller had already known each other for years, and only discussed a possible sale after casually meeting on the street and not by reason of the broker; and broker had no part in the negotiations]; *Neiswender v. Campbell* (1932) 119 Cal.App. 504, 506-507.)

"Where several agencies have been active in bringing about a sale, it may happen that each has contributed something without which the result would not have occurred. One may have found a buyer who would otherwise have been overlooked, and yet that buyer may actually make his bargain through a different instrumentality. In such case, the crucial question is, which was the predominating efficient cause? . . . [¶] To constitute himself . . . the predominating effective cause, it is not enough that the broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest. He must set in motion a chain of events, which, without break in their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities." (*Sessions v. Pacific Improvement Company* (1922) 57 Cal.App. 1, 17; see also *Nelson v. Mayer* (1954) 122 Cal.App.2d 438, 445.)

17

Nevertheless, it is not " 'always necessary that the purchaser should be actually introduced to the owner by the broker provided it appears affirmatively that the purchaser was induced to apply to the owner through the instrumentality of the broker, or through means employed by the broker. It is sufficient if the sale is effected through the efforts of the broker or through information derived from him.' [¶] . . . [¶] So when the broker is in fact the primary procuring cause, the law will not deprive him of his commission because the negotiations were completed through someone else, and even perhaps without the broker having himself met or communicated personally with the buyer." (*Sessions v. Pacific Improvement Company*, *supra*, 57 Cal.App. at p. 18; *Chamberlain v. Abeles* (1948) 88 Cal.App.2d 291, 296-297.) In some cases, where a broker procures a buyer, he is entitled to his commission even though the final negotiations take place between the buyer and the seller and the purchase is consummated after expiration of the listing agreement. (*E.A. Strout Western Realty Agency, Inc. v. Lewis* (1967) 255 Cal.App.2d 254, 258 (*E.A. Strout*), citing *Wilson v. Roppolo* (1962) 207 Cal.App.2d 276, 280-281 [broker was procuring cause even though the sale was consummated after the listing agreement expired and some of the sale terms varied from the listing] & *Oaks v. Brahs* (1955) 132 Cal.App.2d 182, 184 ["Upon that sale being consummated, even though the final consummation resulted from negotiations directly between the buyer and seller, the commission had been earned and must be paid"]; see also *Rose v. Hunter* (1957) 155 Cal.App.2d 319, 325.) "The principal cannot escape his liability to the agent where he revokes the agent's authority, after a prospective purchase for the property has been procured, in bad faith and for the purpose of avoiding the payment of the agreed

18

commission." (*Rose v. Hunter*, at pp. 324-325; see also *Palmtag v. Danielson* (1947) 30 Cal.2d 517, 521 [if a broker procures a purchaser willing to pay a lower price than the asking price, the owner cannot deprive the broker of his commission by conducting the final negotiations himself and selling at a lower figure to the purchaser procured by the broker].)

In *E.A. Strout*, the court held there was substantial evidence to support the trial court's finding that a broker was entitled to a commission as the " 'primary procuring cause, and the predominate effective cause of the sale.' " (*E.A. Strout*, *supra*, 255 Cal.App.2d at pp. 259-260.)  The broker had procured a prospective buyer, James, who was unable to finance the property's purchase and who ultimately brought his brother together with the sellers to purchase the property directly from the sellers after the listing agreement had expired.  (*Id*. at pp. 255-257.)  Setting aside as irrelevant the parties' arguments as to a possible joint venture and enforceability of the purchase contract, the appellate court found "the crux of the case is whether plaintiff can be said to be the 'procuring cause' of the sale by reason of the initial contact with James and [his wife] Lucille, by arousing their interest in the property through its advertising material, by introducing James and Lucille to defendant owners, and by the many conversations with and services rendered to the Davises [*sic*] by plaintiff's agent." (*Id*. at p. 258.)  The evidence supported an inference that the brother bought the property because of James and for James's benefit.  (*Id*. at p. 259.)  The court held it "immaterial" that the brother and sellers themselves engaged in final negotiations or that they consummated the sale after expiration of the listing.  (*Id*. at pp. 258, 259.)

B. *Prudential's Contentions*

Prudential contends the trial court erred when it found Prahm was the procuring cause of the Joergers' purchase of the Sammis property. Asserting the Joergers severed their relationship with Prahm in July 2007, it maintains the evidence demonstrates Joerger and Sammis did not enter into a cognizable purchase agreement until October 2007 and the transaction was not consummated until three months later following further negotiations, threatened cancellations of escrow, and changes to the essential terms of the purchase agreement. In view of this evidence, Prudential suggests Prahm's contribution was incidental or merely " 'one in a chain of causes' "; that Prahm's activities were not the predominant cause in bringing about the Joergers' purchase because he "did not bring the parties to an agreement" and thus his right to a commission on the eventual purchase did not accrue. According to Prudential, the only document that could constitute Prahm's acceptance of Prudential's unilateral offer of compensation was the Joergers' June 18, 2007 letter of intent prepared without Prahm's assistance, but it maintains the letter is not an enforceable offer to purchase and is irrelevant to the determination since Joerger revoked it before Sammis responded.

In making these arguments, Prudential selects and characterizes the evidence in a manner favorable to its contentions; it has not summarized all of the evidence favoring Prahm, or even all of the evidence relied upon by the trial court to support its procuring

20

cause finding.[7]  It also makes assertions unsupported by the record.[8]  This arguably

results in a forfeiture of the claim.  " 'It is well established that a reviewing court starts

---

[7]     Though Prudential quotes from the statement of decision, it does not include many of the trial court's factual findings in its statement of facts, nor does it pass upon the sufficiency of the evidence of several of the court's findings.  Prudential ignores the trial court's finding that Joerger's reasons for terminating his agency relationship with Prahm were "obviously pretextual."  It does not discuss whether the evidence supports the court's findings that Prahm accepted the Joergers' request for help to search for a residence; Prahm "immediately engaged in direct communications with the Joergers"; "Prahm's activities included ascertaining the desired property characteristics and an acceptable price range"; Prahm created a list of several properties and "at the earliest opportunity" arranged for Mrs. Joerger to physically inspect it; that "[i]t was apparent to all that Mrs. Joerger was impressed with the property"; and Prahm's "activities also included researching and analyzing the property sufficiently for him to determine that notwithstanding the $15 to $17 million offering price, the value of the property did not exceed $10 million . . . , the exact number that Mr. Joerger, approximately two months thereafter, offered in a letter of intent prepared at a time when Prahm was known to be out of the country."  Additionally, Prudential selectively characterizes Kurt Joerger's April 19, 2007 email responding to Prahm's request that Joerger set out his pros and cons about the various properties, omitting Joerger's statement that the Sammis property was "all positive, and the only real contender at present . . . ."  Prudential asserts Prahm and the Joergers did not view properties during rush hour on April 24, 2007, after Prahm set up an appointment to do so, but in fact Prahm testified that the viewing took place.  Prudential mischaracterizes Prahm's April 24, 2007 email regarding his efforts on the Joergers' behalf, and it ignores Prahm's correspondence with Kurt Joerger in early May 2007 regarding Joerger's interest in obtaining drawings of the Sammis property with the idea of developing it.  Prudential also includes extraneous facts that are not supported by record citations, such as the statement, "*To everyone's surprise*, escrow closed on the Joergers' purchase of the subject property on December 31, 2007."  (Italics added.)  Prudential cites only the purchase agreement for this statement.

[8]     Prudential states:  "Throughout Prahm's involvement with the Joergers, the Joergers continued to view numerous other properties—*both with and without the assistance of Prahm*."  (Italics added.)  As support for this assertion, it cites to Prahm's testimony that in April 2007 Kurt Joerger had told him the Joergers did not need to spend much time at the Sammis property until Sammis became realistic in price.  Prahm was asked:  "It is true, is it not, that you continue to show the Joergers multiple properties in addition to the Sammis property throughout the time period before you left on your vacation to Denmark, correct?"  Prahm responded, "That's correct."  There is no

21

with the presumption that the record contains evidence to sustain every finding of fact' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881), accordingly, the recitation of only evidence favorable to the appellant "is not the 'demonstration' contemplated under the above rule." (*Ibid.*) To effectively challenge the sufficiency of the evidence, it is Prudential's burden as cross-appellant to present " 'all of the evidence touching upon the question involved. When the appellant fails to abide by this well established and necessary rule of appellate practice, the appellate court is entitled to indulge in a presumption that the evidence sustains the determination of the trial court.' " (*Fox v. Federated Department Stores, Inc.* (1979) 94 Cal.App.3d 867, 872-873, fn. 3; see also *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557 [an appellant challenging factual findings by a judge in a nonjury trial must "marshal *all* of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding"].)

C. *The Court's Procuring Cause Finding is Supported by Substantial Evidence*

Despite the deficiencies in Prudential's arguments, we nevertheless conclude the evidence amply supports the trial court's procuring cause finding. As indicated, whether Prahm was a procuring cause of the Joerger/Sammis transaction is a question highly dependent on the facts. (See *Buckaloo v. Johnson*, *supra*, 14 Cal.3d at pp. 820-821, fn. 2; *Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1526; *Jones v. Foster* (1931) 116 Cal.App. 102, 108.) Where the evidence conflicts on the issue, the conclusion as to the

indication at the cited portion of the record that the Joergers viewed other properties without Prahm in that time frame.

22

procuring cause is one for the trial court and will not be disturbed on appeal. (*Willson v. Turner Resilient Floors* (1949) 89 Cal.App.2d 589, 595, citing *Jones v. Foster*, at p. 108; *Chamberlain v. Abeles*, *supra*, 88 Cal.App.2d at p. 296 [same]; *Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 465-466 [same].)

In assessing the trial court's procuring cause finding for substantial evidence, we view the evidence and indulge every reasonable inference from it in Prahm's favor. (*SFPP v. Burlington Northern & Santa Fe Ry. County.* (2004) 121 Cal.App.4th 452, 461-462; *E.A. Strout*, *supra*, 255 Cal.App.2d at p. 258.) "When a trier of fact's resolution of disputed facts is challenged on the ground that there is no substantial evidence to sustain it, the power of the appellate court begins and ends with the determination as to whether on the entire record there is substantial evidence contradicted or uncontradicted that supports the finding. [Citation.] This standard, however, does not require us to blindly seize any evidence in support of the trier of fact's findings in order to affirm the judgment. [Citation.] Rather, it compels us to determine whether a reasonable trier of fact could have found for the respondent based on the entire record. [Citation.] This is so because 'substantial' is not synonymous with 'any' evidence, but refers to the quality, not the quantity of the evidence. [Citation.] So, after reviewing the whole record, we must determine whether there exists substantial evidence, which is evidence of ponderable legal significance that is reasonable, credible and of solid value, supporting the challenged findings of the trier of fact." (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1282-1283.)

23

DiLauro's opinion testimony, which is unchallenged on appeal by Prudential, itself constitutes substantial evidence to support the trial court's finding. (See *Leung v. Verdugo Hills Hosp.* (2012) 55 Cal.4th 291, 308-309; *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487; *Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1193.) But setting that aside, the evidence shows Prahm, at the Joergers' request, expended extensive effort on their behalf in researching and locating desirable properties, and ultimately introduced them to the Sammis property, culminating in Kurt Joerger sending Sammis a letter of intent at the very price—$10,000,000—Prahm had advised the Joergers the property was worth. There is no dispute Prahm originally brought the Joergers and Sammis together (see *Williams v. Kinsey* (1946) 74 Cal.App.2d 583, 593), and via his efforts, they eventually came to consider the Sammis property their "only contender" to the extent of putting in an informal offer in June 2007, which led to further negotiations and the ultimate deal in December 2007. This evidence is sufficient to support the court's conclusion that Prahm's efforts were, in fact, the "effective cause" of the transaction. (Accord, *E.A. Strout*, *supra*, 255 Cal.App.2d at pp. 255-257; *Wilson v. Roppolo*, *supra*, 207 Cal.App.2d at p. 280; *Chamberlain v. Abeles*, *supra*, 88 Cal.App.2d at p. 296 [originating cause, which ultimately led to the conclusion of the transaction, is held to be the procuring cause].) This is so despite Kurt Joerger's attempt to exclude Prahm in July 2007, which the trial court found, without challenge by Prudential on appeal, was merely a pretext to avoid paying any additional commission. (*Rose v. Hunter*, *supra*, 155 Cal.App.2d at pp. 324-325.) This is not a situation where Prahm

24

merely called the Sammis property to the Joergers' attention and did nothing further, as in *Hill v. Knight*, *supra*, 209 Cal. 14.

We cannot say the evidence demonstrates a clear break in the chain of events sufficient to render the court's procuring cause finding without support.  Hawkes testified that in October and November 2007, Joerger and Sammis continued to engage in negotiations, albeit turbulent; Joerger had trouble with financing and was "in constant contact" with her and Gilchrist about his lenders.  According to Hawkes, during this time the Joergers walked away from the deal several times.  The trial court assessed credibility and either rejected Hawkes's testimony, or found these difficulties did not change Prahm's status as the predominate cause of Joerger and Sammis's eventual deal.  Nor is the court's procuring cause finding invalidated by the passage of several months from the time Prahm was asked to desist his involvement in July 2007 and the ultimate sale in December 2007.  (Accord, *Vidler v. De Bell* (1954) 125 Cal.App.2d 326, 329 [evidence amply supported trial court's conclusion that broker's sales agent was the procuring cause of a sale where he introduced the purchaser to the seller and was in touch with purchaser for about one month, the seller then told the sales agent to "leave [the purchaser] alone" and the seller "[would] take care of him," and the agreement to purchase was executed some four months after the broker's last contact with them; "[t]he interpretation was for the trial court as to whether or not this was a break in the chain of events"].)  To the extent there was any break in Prahm's effort, it was only the consequence of Kurt Joerger's ruse to exclude him from the transaction so as to obtain a more favorable purchase price.  Under these circumstances, where Prahm's efforts brought the Joergers

25

and Sammis together and they eventually consummated their transaction, it is not fatal to the court's procuring cause finding that Prudential's MLS listing expired in September 2007. (*E.A. Strout*, *supra*, 255 Cal.App.2d at p. 259; *Wilson v. Roppolo*, *supra*, 207 Cal.App.2d at pp. 280-281.)

Prudential seeks to distinguish *E.A. Strout*, *supra*, 255 Cal.App.2d 254 and characterizes it as inapposite, pointing out the case predates the current MLS system and involves a non-exclusive "open" listing, as well as a procuring cause claim by a *listing agent* against the *seller*. Prudential does not, however, explain the legal significance of the different listing agreements on the procuring cause analysis,[9] or whether the MLS system changes that analysis merely because Prahm was not seeking a commission as a listing agent, but as a cooperating broker. Rather, Prudential simply focuses on the facts and characterizes them in its favor, asserting this case involves "a claim by an agent who was not involved in the sale, who never presented any signed document in furtherance of

---

[9] Section 1086 defines the types of listings. An exclusive right to sell listing "is a listing whereby the owner grants to an agent, for a specified period of time, the exclusive right to sell or to find or obtain a buyer for the property, and the agent is entitled to the agreed compensation if during that period of time the property is sold, no matter who effected the sale, or the listing agent receives and presents to the owner any enforceable offer from a ready, able, and willing buyer on terms authorized by the listing or accepted by the owner. The exclusive right to sell listing may provide for compensation of the listing agent if the property is sold within a specified period after termination of the listing to anyone with whom the agent has had negotiations before that termination." (§ 1086, subd. (f)(1).) An open listing "is a listing which grants no exclusive rights or priorities to the listing agent, and a commission is payable to the agent only if the agent procures and presents to the owner an enforceable offer from a ready, able, and willing buyer on the terms authorized by the listing or accepted by the owner, before the property is not otherwise sold either through another agent or by the owner directly and before the listing expires by its terms or is revoked." (§ 1086, subd. (f)(3).)

26

the sale, who had no agency agreement with the buyer, and with whom the ultimate buyer unequivocally severed his relationship." It has not established any distinction rendering *E.A. Strout*'s procuring cause discussion inapplicable.

## II. *Prahm's Appeal of the Trial Court's Determination of Damages*

Prahm contends that pursuant to section 3302 and MLS rules 7.12 and 7.13, he was entitled to recover the full amount of the 2.5 percent commission offered in the MLS listing advertised to brokers and other MLS participants, including Coldwell Banker. He argues the trial court's finding underlying its reduction in damages—that the parties had agreed to reduce their commission and share it equally in order to close the deal—is not supported by any evidence. Prahm maintains his testimony was that he would need approval from Coldwell Banker to implement such a reduction and the testimony from agents Hawkes and Gilchrist did not establish Coldwell Banker's agreement to be paid less than two percent of the selling price. Further, Prahm argues the agents were not parties to the contract, and as a consequence lacked authority to make any agreement regarding the cooperating broker commission. Thus, Prahm argues, even if the facts supported the trial court's finding as to an agreement by the agents to reduce their commission, those facts could not support a modification of the MLS listing agreement as a matter of law.

Prudential concedes that by listing the Sammis property on the MLS, it extended a unilateral offer of compensation to participating MLS brokers, which would be accepted by any broker who procured an eventual purchaser for the property. It argues, however, that the MLS rules, specifically MLS rule 7.16, gives listing brokers the right to

27

unilaterally change the offer of compensation to all broker participants, and that substantial evidence supports the court's finding that the parties here modified Prudential's unilateral compensation offer so as to facilitate the transaction.

A. *The Applicable MLS Rules*

The parties agreed at trial, in accord with their respective experts' testimony, that the MLS rules applied to the parties' relationship and were by definition incorporated by reference into their contract.[10] Thus, with respect to the MLS rules, we apply the analogous principle that " '[a]pplicable law becomes part of the contract as fully as if incorporated by reference . . . .' " (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71.)

Prudential's concession about the contractual nature of its listing is consistent with MLS rule 7.12, entitled Unilateral Contractual Offer, which provides in part: "In filing a property with the MLS, the broker participant makes a blanket unilateral contractual offer of compensation to the other MLS broker participants for their services in selling the

_____

[10]    Even if the parties had not agreed that the MLS rules were incorporated by reference, the court would have properly considered them as evidence of industry custom. The custom and practice in an industry is relevant to the interpretation of a contract and may inform its meaning, where no contrary intent appears from the contract terms. (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114; *Ecco–Phoenix Electric Corp. v. Howard J. White, Inc.* (1969) 1 Cal.3d 266, 271; *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.* (1988) 205 Cal.App.3d 442, 451.) If evidence regarding custom and practice is not in conflict and there is no other conflict in the extrinsic evidence, the interpretation of a contract in light of the custom and practice, and in light of any other extrinsic evidence, is a question of law for the court alone to decide. (See *City of Hope Nat. Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Parsons v. Bristol Development Co.*, *supra*, 62 Cal.2d at p. 865; *City of El Cajon v. El Cajon Police Officers' Assn.*, *supra*, 49 Cal.App.4th at p. 71.)

property. Except as set forth in Rule 7.15 below or pursuant to California Civil Code Section 1087, a broker participant must specify some compensation to be paid to the buyer's agent or a subagent and the offer of compensation must be stated in one, or a combination of, the following forms (1) a percentage of the gross selling price; or (2) a definite dollar amount. The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or event."

MLS Rule 7.13, entitled Acceptance of Contractual Offer, provides in part: "The broker participant's contractual offer (with or without subagency) is accepted by the participant/selling broker by procuring a buyer which ultimately results in the creation of a sales or lease contract. Payment of compensation by the participant/ listing broker to the participant/cooperating broker under this section is contingent upon either (1) the final closing or (2) the participant/listing broker's receipt of moneys resulting from the seller's or buyer's default of the underlying sales or lease contract. Notwithstanding this section, the listing broker and/or cooperating broker shall still retain any remedies they may have against either the buyer or seller due to a default under the terms of the purchase agreement, listing agreement or other specific contract."

MLS rule 7.16, entitled Changes to Offer of Compensation By Listing Broker to All Broker Participants, provides: "The listing broker participant may, from time to time, adjust the published compensation offered to all MLS broker participants with respect to any listing by changing the compensation offered on the MLS or providing written notice to the MLS of the change. Any change in compensation will be effective after the change

is published in the MLS, either through electronic transmission or printed form, whichever occurs first. The listing broker may revoke or modify the offer of compensation in advance as to any individual broker participant in accordance with general contract principles but in no event shall the listing broker revoke or modify the offer of compensation without the cooperating broker's consent later than the time the cooperating broker (a) physically delivers or transmits by fax or email to the listing broker a signed offer from a prospective buyer to purchase the property for which the compensation has been offered through the MLS, or (b) notifies the listing broker in person or by telephone, fax or email that the cooperating broker is in possession of a signed offer from a prospective buyer to purchase the property for which compensation has been offered through the MLS and is awaiting instructions from the listing broker as to the manner of presentation or delivery of that offer. Any independent advance revocations, modifications of the offer or agreements between real estate brokers are solely the responsibility of such brokers and shall not be submitted to, published by, or governed in any way by SANDICOR, Inc."

B. *Legal Principles Regarding Contract Interpretation, Unilateral Contracts and Modification*

"The interpretation of a contract term presents a question of law we review independently. [Citation.] 'We infer the parties' intent from the written provisions of the contract. [Citation.] The written provisions of a contract "are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by

usage . . . ." [Citation.] [¶] "Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning." [Citation.] "An ambiguity arises only if '. . . there [is] more than one construction in issue which is semantically permissible . . . .' " ' " (*Schaffter v. Creative Capital Leasing Group, LLC* (2008) 166 Cal.App.4th 745, 751.)

"In a unilateral contract, there is only one promisor, who is under an enforceable legal duty. [Citation.] The promise is given in consideration of the promisee's act or forebearance." (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 10, citing 1 Corbin on Contracts (1993) § 1.23, p. 87.) This is so in the context of a listing filed with the MLS: " 'When [a] listing is filed with the Multiple Listing Service there is an express offer to pay compensation to a member of the Service who procures a buyer; the amount of the compensation is stated as a specific sum or a percentage of the sales price of the property.' " (*Colbaugh v. Hartline*, *supra*, 29 Cal.App.4th at p. 1523, fn. 3, quoting (1 Miller & Starr, Cal. Real Estate (2d ed.1989) § 2:30, p. 621.)

A contract that is unilateral at inception, may, through the acts of the parties, ripen into a bilateral contract. (*Los Angeles Traction Co. v. Wilshire* (1902) 135 Cal. 654, 658 ["The contract at the date of its making was unilateral, a mere offer that, if subsequently accepted and acted upon by the other party to it, would ripen into a binding, enforceable obligation"]; see *Baumgartner v. Meek* (1954) 126 Cal.App.2d 505, 508; *Caldwell v. Dalaray Mines* (1945) 68 Cal.App.2d 180, 183.) A written listing that is an offer of a unilateral contract to be accepted by performance of a requested act results in a contractual relation: "Though the basic offer to pay a commission for the procuring of a

31

purchaser ready, able and willing to buy can still be accepted only by performance, nevertheless it has been held that these restrictive stipulations bind the owner and subject him to liability if he refuses to abide by them." (*Baumgartner*, at p. 509.)

Proof that parties orally modified the written listing must meet the test of section 1698. (*Coldwell Banker & Co. v. Pepper Tree Office Center Associates* (1980) 106 Cal.App.3d 272, 279, disapproved as to clear and convincing proof standard in *Barrett v. Bank of America* (1986) 183 Cal.App.3d 1362, 1371.) A written contract may be modified by another written contract. (§ 1698, subd. (a).) It may be modified by an oral agreement to the extent it is "executed by the parties" (§ 1698, subd. (b)), or supported by new consideration and the statute of frauds is satisfied. (§ 1698, subd. (c).) Additionally, a written contract can be modified by an oral agreement under the doctrines of rescission, waiver, novation and substitution, estoppel and independent or collateral agreements. (§ 1698, subd. (d); *Coldwell Banker*, at p. 279.)

C. *The MLS Listing Bound Prudential to Pay Prahm a 2.5 Percent Commission as the Procuring Cause; There is No Substantial Evidence of an Enforceable Modification of the Written Listing*

The contents of Prudential's MLS listing, which here includes the MLS rules, determine the parties' rights. (See, e.g., *Colbaugh v. Hartline*, *supra*, 29 Cal.App.4th at p. 1526; *Howard Gitlen & Associates, Inc. v. Ameri* (1989) 208 Cal.App.3d 90, 95; see 2 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 5:26, p. 5-116.) Under the plain terms of the listing, as supplemented by MLS rules 7.12 and 7.13, Prahm accepted Prudential's unilateral contractual offer of compensation—and the offer ripened into a binding,

32

enforceable obligation—when he procured the Joergers as buyers, and payment of a commission to him was "contingent upon . . . a final closing . . . ." (MLS rule 7.13.) Having upheld the trial court's finding that Prahm procured the Joergers, and in view of the undisputed evidence that Sammis and Joergers consummated their transaction in December 2007, the listing agreement entitled Prahm to 2.5 percent of the $9,889,000 purchase price, or $247,225.

Here, however, the trial court found that the "parties had previously agreed to reduce and share equally in the commission . . . " and that "the decision to accept this negotiated sum . . . had the legal effect of modifying the gross commission proceeds available to the competing parties . . . . " (Footnote omitted.) MLS rule 7.16 gives Prudential the ability to modify its offer of compensation to all MLS broker participants if it publishes the change in the MLS. The rule also gives Prudential the ability to modify its offer in advance as to any *individual* broker participant but only "*in accordance with general contract principles* . . . ." (MLS rule 7.16, italics added.) Thus, with respect to Prahm's commission, any modification of the listing agreement had to comport with section 1698, in that, if the modification was oral as it was purported to be here, it either had to be supported by consideration, or be fully executed. (§ 1698, subds. (b), (c).)

The evidence of Prahm's June 28, 2007 meeting with Hawkes and Gilchrist does not meet the legal standards for modification. We interpret the term "executed" as that term is normally used in contract law, that is, in order to be executed, the agreement "must be fully performed on both sides." (*Lockheed Missiles & Space Co. v. Gilmore Industries, Inc.* (1982) 135 Cal.App.3d 556, 559; see also § 1661 ["An executed contract

33

is one, the object of which is fully performed"]; *Coldwell Banker & Co. v. Pepper Tree Office Center Associates*, *supra*, 106 Cal.App.3d at p. 280 [an oral agreement not to perform is executed by not performing].) Here, the three agents merely discussed reducing the commission generally and, viewing the testimony in the light most favorable to the trial court's finding, agreed to drop it from 2.5 percent to 2 percent. But that agreement was never carried out by Prudential by either publishing the change in the MLS in accordance with MLS rule 7.16, or by actually paying Prahm the reduced commission upon the close of escrow.

Further, the MLS listing—as an "agreement authorizing . . . an agent . . . or any other person to . . . procure, introduce, or find a purchaser . . . of real estate"—is subject to the statute of frauds. (§ 1624, subd. (a)(4); *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1255.) Thus, an oral modification is precluded by the statute of frauds. Even if that were not the case, we see nothing in the evidence indicating there was any performance in addition to that already bargained for that might serve as consideration for a modification (see *Goodman v. Citizens Life & Cas. Ins. Co.* (1967) 253 Cal.App.2d 807, 817-818; *M/V American Queen v. San Diego Marine Const. Corp.* (9th Cir. 1983) 708 F.2d 1483, 1489) or forbearance sufficient to constitute consideration. (*Coldwell Banker & Co. v. Pepper Tree Office Center Associates*, *supra*, 106 Cal.App.3d at pp. 279-280.)

Though it acknowledges the court's modification finding must be supported by substantial evidence, Prudential's arguments do not convince us that such evidence exists. It quotes the relevant portions of the court's statement of decision, then complains about

34

the possible loss of its *own* portion of the commission: "Prahm asked the trial court, and is asking this court, to award him the full commission set forth in the original listing agreement. If the court were to grant Prahm his requested relief, the result would be to deny Prudential any compensation whatsoever for its lengthy listing and marketing of the subject property. This would defeat the parties' intentions as the evidence shows that the parties never intended to deprive Prudential, the listing agent, of its earned commissions." Ignoring the court's procuring cause finding and discussing evidence tangential to the modification issue, Prudential further asserts Prahm was "fired by the Joergers months before they ever submitted an offer to purchase"; that the Joergers "instructed Prudential that Prahm was no longer [their] agent"; "Prudential continued to represent the sellers only throughout the ensuing months of their off-and-of negotiations with the Joergers"; and Prudential, when instructed to do so, "communicated with the Joergers' representative of choice, [their] attorney . . . ."

The only pertinent argument made by Prudential as to the modification is that the court "look[ed] at the mutual intent of the agents" in determining that the commission agreement was modified. Though Prudential states contract interpretation principles require this analysis, it maintains "no such contract exists here, as Prudential made a unilateral offer which the court found Prahm accepted by introducing at least one of the eventual purchasers to the subject property." Prudential says the issues are "complicated by the fact that Prahm was not involved with the Joergers' purchase of the subject property at the time they finally submitted an offer on September 29, 2007" and so it was the June 28, 2007 meeting that reflects the modification agreement: "[T]he court found

35

that the agents recognized the need to cut the proposed broker compensation amount in order to be in a potential position to earn any commissions at all" and "determined that the transaction would not and could not have been consummated had the commissions not been reduced." Finally, Prudential asserts: "Contrary to Prahm's assertions at trial, there was no evidence that Prudential purposefully exclude Prahm [*sic*] from any of the commission negotiations. Rather, the evidence clearly supported the trial court's finding that Prudential was instructed by the Joergers not to deal with Prahm. The evidence supports the court's ruling that had the commission structure not been adjusted downward, the transaction would never have happened."

These arguments are unavailing in view of the foregoing principles governing an enforceable modification. Absent evidence of a viable modification of the listing agreement, we must reverse the judgment as to Prahm's damages.

### III. *Prejudgment Interest Determination*

The trial court ruled Prahm's damages were subject to calculation under section 3287, subdivision (b) and awarded him prejudgment interest from the July 1, 2010 filing date of his complaint. This ruling was premised on the court's finding that the parties had modified the written MLS listing and negotiated a lesser commission, a factual finding that is not supported by the evidence.

Section 3287 provides for prejudgment interest on damages recoverable when the amount due is capable of ascertainment. Subdivision (a) provides in pertinent part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular

36

day, is entitled also to recover interest thereon from that day . . . ."  (§ 3287, subd. (a).)

Under section 3278, subdivision (b), the trial judge has discretion to award prejudgment interest on "a cause of action in contract where the claim was unliquidated."

To recover prejudgment interest under section 3287, subdivision (a), it must be shown that the defendant knew the amount due, or could have computed it from reasonably available information.  (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907.)  The rationale is that a defendant should not be liable for interest on sums he could not have determined without a trial.  (*KGM Harvesting Co. v. Fresh Network* (1995) 36 Cal.App.4th 376, 391.)  Thus, prejudgment interest is allowable where the amount due a plaintiff is fixed by the terms of a contract. (*Great Western Drywall, Inc. v. Roel Construction Co., Inc.* (2008) 166 Cal.App.4th 761; *National Farm Workers Service Center, Inc. v. M. Caratan, Inc.* (1983) 146 Cal.App.3d 796, 809.)

"If damages are 'certain,' interest must be awarded as a matter of right.  [Citations.] Moreover, '[damages] are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' "  (*National Farm Workers Service Center*, *Inc. v. M. Caratan, Inc.*, *supra*, 146 Cal.App.3d at p. 809; *North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828.)

As we have concluded above, Prahm's commission as the cooperating broker was readily ascertainable from the MLS listing, and was set at 2.5 percent of the property's sales price. That agreement became an enforceable bilateral obligation when Prahm procured the Joergers, contingent and payable on the close of the Joerger/Sammis sales transaction. At trial, Prudential disputed Prahm's status as a procuring broker, and his entitlement to any commission for his efforts. But that dispute over liability does not impact the prejudgment interest analysis. Because the amount of Prahm's commission was a matter of arithmetic and capable of calculation at the time the Joergers and Sammis closed escrow on the Sammis property, Prahm is entitled as a matter of right to prejudgment interest on the principal amount of $247,225 from December 31, 2007. (Accord, *McDonald v. Bernard* (1927) 87 Cal. App. 720; *McKinley v. Lagae* (1962) 207 Cal.App.2d 284, 294.)

IV. *Recovery of Expert Witness Fees Under Code of Civil Procedure Section 998*

Before trial, Prahm served Prudential with a Code of Civil Procedure section 998 offer to compromise by having a judgment entered in his favor for $166,999.00 including costs. Prudential apparently rejected the offer.

After trial, Prahm filed a cost memorandum seeking, in part, to recover $13,134.70 in expert witness fees. Prudential moved to tax Prahm's requested costs, including the expert fees, arguing the court did not order expert testimony in the case, Prahm did not obtain a more favorable judgment than his $166,999.00 offer, and he had not provided backup evidence of payment for any of his costs. Prahm did not oppose Prudential's motion with respect to his expert fees, and on October 12, 2012, the trial court,

38

acknowledging Prahm's silence that issue, granted Prudential's motion in part, awarding Prahm $8,466.39 in costs.

Prahm challenges the trial court's ruling as to his expert fees, on grounds he is now entitled to those fees because the judgment for his commission should have been more favorable than his offer.  We conclude we lack jurisdiction over this challenge because, while Prahm appealed from the May 14, 2012 judgment and the July 13, 2012 order awarding prejudgment interest, he did not separately appeal from the trial court's October 12, 2012 order granting in part and denying in part Prudential's motion to tax.  (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1315-1318.)

DISPOSITION

The judgment is reversed and the matter remanded with directions that the trial court enter a new judgment awarding Ole Prahm $247,225, plus prejudgment interest on that amount from December 31, 2007.  Prahm is entitled to recover his costs on appeal.

O'ROURKE, J.

WE CONCUR:

NARES, Acting P. J.

HALLER, J.

39